In the Matter of The Petition of Mortimer Livingston and Henry W. Livingston, Infants, by John Livingston, their Guardian, for the removal of Daniel C. Birdsall from the office of Trustee under the Trust Deed of William Winter.

*William Winter* having executed a trust deed, conveying to *Daniel C. Birdsall* all his real estate, upon *trust*, to receive the rents and profits thereof to the use of William Winter during his life, and upon his death to assign and convey the same to his lawful issue, if living at the time of his death, according to the rules prescribed by statute regulating the descent of real property, and, in case of dying without issue, then upon the further *trust* to assign and convey the same to his nephews — *Held:*

    1. That, so far as the deed creates a trust in Birdsall to receive the rents and profits to the use of the *cestui que trust* for life, it is expressly authorized by statute. (1 R. S., 728, § 55.) So far as it requires the trustee to assign and convey the legal estate to those who shall be entitled in remainder, his services will be useless, as the transfer will be made, if at all, by operation of the statute of uses, and his office of trustee will then cease. (1 R. S., 730, § 67.)

    2. That the nephews are not interested in the *express trusts* therein created, within the meaning of the statute authorizing the court, upon their petition, to remove the trustee and appoint another in his place. (1 R. S., 728, §§ 70–72.)

    3. That, as William Winter has no children, the petitioners (his nephews) take a vested remainder under our statutes; and if the tenant for life is guilty of any species of *waste*, calculated materially to injure or destroy its

value, they may proceed by injunction bill, in which action they may obtain security from the tenant for life for the due performance of all those duties which the law casts upon him in respect to the preservation of the *corpus* of the estate.

4. That the tenant for life, in respect to these duties, stands in the relation of a trustee to the remainderman; but this is an *implied* — not an *express* trust.

5. That the statute authorizing the court to remove a trustee from his office on petition, does not extend to implied or constructive trusts.

6. That although no objection was taken by the appellants to the jurisdiction of the court below to proceed by petition, it is not too late to raise the question on appeal.

7. That, as a general rule, petitions can only be presented in an action already commenced, or in a matter over which the court has jurisdiction by some act of the legislature or other special authority.

The petitioners having applied to the Supreme Court, at Special Term, for an order removing the trustee, upon the ground of his insolvency and misconduct in the disposition of the rents and profits, to the injury of the *cestui que trust* for life — and the same having been examined and denied upon the merits — afterward applied to the Special Term, held before another judge, for leave to renew the application, which was granted : *Held,* that the rules governing ordinary motions do not apply to special proceedings, and that it was, in effect, an application for a *rehearing,* which must be made in the same manner as upon a decree or decretal order.

*It seems* that under the Code of Procedure, a rehearing upon the merits in an equity action can only be granted by an appellate court.

But if the former practice in relation to rehearings in equity is still in force, the proceedings were erroneous: 1. Because no sufficient grounds were stated therefor in the application; 2. Because it was not reheard before the same judge that heard it before; 3. Because, upon the rehearing before another judge, the matter was *res judicata.*

Parties aggrieved by the order or decree of one judge must take their remedy by appeal, instead of applying to another judge to rehear their complaints.

It having been charged in the petition that *William Winter* was incompetent to devise real estate, and also that the trust deed was procured by fraud and deceit, a court of equity will not enforce it or suffer it to take effect in favor of any of the parties claiming under it.

Assuming, as the petitioners must, that William Winter was competent to create a trust, and that the trust deed is valid, the result is, that the trustee for life is accountable to him, and not to the petitioners, for the disposition of the income of the life estate.

The parties having settled the entire controversy by the execution of a formal deed of settlement, mutually beneficial and advantageous, and the court, at Special Term, having granted an order, upon the stipulation of the parties and their counsel, dismissing the proceedings and vacating all the orders theretofore made in the matter of the petition, without costs to either party — *Held,* that the subsequent order of the judge, made upon the rehearing,

Statement of case.

removing the trustee and substituting another in his place, could not be maintained.

Nor could the order of removal take effect so as to overreach the settlement by force of a second order directing the original order to be amended and ante-dated, *nunc pro tunc*, as of a day prior to the date of the settlement.

An application having been made before another judge, at Special Term, by the substituted trustee, for an order vacating the order of discontinuance, on the ground of the alleged fraud of the appellants in procuring a settlement of the controversy, and the same having been granted — *Held*, that it was erroneously granted, not only upon the merits, but also for the reason that the substituted trustee had no standing in court to question the settlement upon any such ground.

A court of equity will enforce an agreement made on behalf of an infant by his guardian, when it appears to have been made for his benefit.

An appeal in special proceedings is expressly given by the Laws of 1854 (p. 592, § 1). The orders appealed from also affect a substantial right, made in a special proceeding under section 1 of the Code, and for that reason are appealable to this court, under section 11.

The Code having made no provision for a finding of facts in such a case, the appeal necessarily takes along with it the whole merits of the determination appealed from.

This being a special proceeding in equity, the appellate court may not only reverse, but, if necessary, make such final order or decree in the premises as justice may require.

ON the 27th of February, 1862, Gabriel Winter died intestate, seized of real estate situate in New York and Queens counties of the value of $200,000, and personal estate of the value of $25,000, leaving him surviving his widow Jane Winter (who died April 19th, 1862), and William Winter, his son, and Mortimer Livingston and Henry W. Livingston, his grandchildren by his daughter Mary Jane (who died March 29th, 1858), his only heirs. Letters of administration were taken-out May 21, 1862, by his son William Winter, with whom was joined John Livingston, the father of the above named Mortimer and Henry W. Livingston, who are infants. All the property and papers belonging to the estate, as well as the business thereof, were taken into the charge and possession of John Livingston; and he proceeded to collect the rents, made the repairs, paid the taxes, made insurances, and (as he says) exercised general supervision and control over the same; except as to the sum of $5,811.16 belonging to the estate, which was deposited with the United States

Trust Company to be drawn out only on their joint checks. Afterward, and on the 20th day of January, 1863, upon the application of John Livingston as guardian for his children, a commission *de lunatico inquirendo* was issued out of the Supreme Court, directed to three commissioners to inquire into the alleged unsoundness of mind of William Winter. The commission was duly executed, and a verdict rendered that William Winter was not of unsound mind. Upon application to the court, this verdict was confirmed October 17, 1863, although two of the commissioners certified that they thought the verdict was erroneous.

Livingston thereupon took measures to obtain a trust deed, still believing (as he says) said William to be wholly incompetent to manage his own affairs in consequence of his well known weakness of mind and credulity ; and that the only practical mode remaining to secure William against want, by saving to his own use his real estate, was by obtaining the execution of a trust deed under the statute. On the 4th day of December, 1863, Livingston delivered to Daniel C. Birdsall, who had been the attorney of William Winter, an engrossed copy of the proposed trust deed, leaving the name of the proposed trustee a blank. Birdsall returned it unexecuted; and then another was drawn up making some alterations and naming *Daniel C. Birdsall* as trustee. After Mr. Winter had taken counsel of Judge EDMONDS, and on the 23d day of December, 1863, a trust deed was formally executed to Daniel C. Birdsall as trustee. The circumstances under which it was executed are noticed more at large in the opinion of the court.

This trust deed, after the formal parts, proceeded as follows : "That said William Winter, for and in consideration of the sum of one dollar lawful money of the United States, * * and for settling and granting all his right, title and interest in and to all and singular the real estate and property hereinafter mentioned, upon the trusts and for the purposes hereinafter expressed and declared, hath granted, bargained, sold, aliened, remised, released, conveyed and confirmed, and by these presents doth grant, bargain, sell,

unto the said party of the second part, all the claim, right, title and interest of him, the said William Winter, of, in and to the equal undivided half part of the following described real estate (here follows a description of the same), together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in any way appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof, * * * to have and to hold all and singular the said herein before granted, mentioned and described real estate and property, with the appurtenances, unto the said party of the second part, his successors, and assigns: Upon *trust* to receive the rents and profits thereof to the use of him, the said William Winter, during the term of his natural life, and upon the death of the said Winter, to assign, transfer and convey all and singular the real estate and property herein before mentioned, described and conveyed in manner following: that is to say, to the lawful issue of said William Winter living at the time of his death, according to the rules prescribed by the statute regulating the descent of real property; and in case of said William Winter dying without leaving him surviving any such lawful issue, then upon the further trust to assign, transfer, and convey all and singular the said real estate and property to his nephews now living." Its other provisions are not material.

After the execution of the trust deed, Livingston says that Birdsall proposed to him to permit him to take possession of one-half of the real estate; and on the 29th of January, 1864, he brought to Livingston, for execution, a proposed agreement for that purpose, which Livingston declined, on account of his distrust of Birdsall, fearing "that the only design of Birdsall was to involve the estate in litigation and expense, and that he would manage in such a manner, with reference to William Winter, as to deprive him of his property; said Livingston (as he himself says) finally declined to put Birdsall into possession of any such real estate, and declined to join with him in the execution of any lease or leases thereof, so that he is not now (June 4, 1864) and never has been in

possession of said real estate, or of any part thereof; that Birdsall has never had the management and control of said real estate, and has never paid anything for taxes, insurance or repairs thereon; that, on one occasion, he paid to a painter the sum of $167.50 for account of painting which Livingston had theretofore caused to be done."

Birdsall being dissatisfied with this condition of things, and having, as he alleges, been refused moneys which properly belonged to him under the deed of trust, on the 30th day of May, 1864, commenced a suit against Livingston's children, in partition, to divide the real estate; and obtained an injunction order restraining Livingston from collecting any of the rents of said estate.

On the 4th day of June thereafter, Livingston, as guardian of his infant children, on his petition, papers and affidavits, obtained from Justice J. F. BARNARD an order to show cause before the Special Term, to be held at chambers in the city of New York on the 13th, why Birdsall should not be removed as trustee, and some other person appointed to execute the trusts therein named. The order provided that, in the meantime, and until the further order of the court, Birdsall should refrain from collecting any of the rents, or in any manner interfering with the trust property.

The hearing was finally set down for the 29th of June, with leave to serve additional papers until the 25th. On the first day of July, this petition, after a hearing by Justice LEONARD, holding the Special Term, was denied upon the merits.

Livingston appealed to the General Term, but afterward countermanded his appeal, having, on the 15th day of July following, obtained an order from Justice G. G. BARNARD at a Special Term, to show cause before the court at Special Term in the city hall on the third Monday of July, why the petitioners should not have leave to renew their application for the removal of Daniel C. Birdsall from the office of such trustee under the trust deed of said William Winter, and to apply for the appointment of Daniel Develin, the city chamberlain of the city of New York, as such trustee.

This motion came on before the same justice at Special

Term at the city hall on the first day of August, and, after argument, was granted. And it was further ordered that such application be heard on the 8th day of August at eleven o'clock in the forenoon, before the Special Term, to be held at the city hall.

In pursuance of this direction, the application was renewed before the Special Term then held by Justice JOSEPH F. BARNARD, who took the papers, without rendering a decision at the time.

Prior to the order granting leave to renew the application, a receiver had been appointed in the partition suit, and neither Livingston nor Birdsall were permitted to possess themselves of the rents of the real estate.

On the 3d of October, 1864, and before any decision had been promulgated by Justice BARNARD upon the second application or rehearing, the parties came together and effected a settlement. On that day an agreement was made and entered into between William Winter of the first part, Daniel C. Birdsall, of the second part, and John Livingston, guardian of his children, of the third part, to perfect such settlement; which was duly executed under their respective hands and seals; and which recited that the above named " William Winter, Mortimer Livingston and Henry W. Livingston were heretofore seized in fee simple as tenants in common of all the houses, lots and real estate mentioned in schedules Nos. 1 and 2, hereto annexed, and heretofore owned by Gabriel Winter, their common ancestor, now deceased; and while so seized, the said William Winter made and executed to the above named Daniel C. Birdsall a deed and conveyance in fee of his own equal undivided half of his said houses, lots and real estate *in trust, &c.* (as stated in the trust deed). And whereas, since the execution of the said deed of trust, the said parties of the first and second part have brought an action in the Supreme Court of the State of New York against the said John Livingston, Mortimer Livingston and Henry W. Livingston for the partition among said tenants in common of said houses, lots and real estate; in which action a receiver of the rents, issues and

profits of said houses, lots and real estate has been appointed
by said Supreme Court; and which said receiver is now in
the receipt of said rents and profits; and, whereas, the said
houses, lots and real estate are so situated that it is best for
the interest of all parties concerned that partition thereof
should not now be made, and that the parties interested in
the receipt and enjoyment of said rents, issues and profits
should not be subjected to the losses and expenses necessarily
consequent upon a receivership of the same, and that each
party entitled thereto should have and enjoy the leasing, care
and custody of his or their portion of said houses, lots and
real estate, and the collection and receipt of the rents, issues
and profits thereof; and, whereas, a mutual compromise and
agreement for the settlement and arrangement of all said
matters has been made by and between the said William
Winter and the said John Livingston, as guardian as aforesaid.
(The agreement then proceeded as follows): Now, therefore,
this agreement witnesseth, that from and after the day of the
date hereof, the said Daniel C. Birdsall, as assignee and trus-
tee of William Winter as aforesaid, shall have and enjoy the
exclusive right of letting and leasing the several houses, lots
and real estate particularly mentioned and described in
schedule No. 1, to this indenture annexed, and of collecting
and receiving the rents, issues and profits thereof."

The agreement then makes a similar provision in favor of
Livingston as to the houses, lots and real estate in schedule
No. 2. It then provides that all the leases shall be in their
joint names, and that no lease shall be given by either of
the parties for a longer term than one year, without the
express consent of both in writing, duly acknowledged. Set-
tlements were to be made on the first day of January and
July in each year, when an account was to be rendered and
a balance struck, and balances paid so as to make each one's
receipts of net proceeds for the half year equal to the others.
Birdsall and Livingston further agreed that each should
keep the buildings properly insured at all times, and promptly
pay all taxes and water rates on the buildings assigned to
them respectively by schedules Nos. 1 and 2, and also should

"keep all parts and portions of said premises in proper and suitable repair, and defray all expenses of so doing;" but neither, however, to exceed $200 in any one half year without the written consent of the other; the insurance to be effected in their joint names. One party could not interfere in the collection of the rents assigned by said agreement to the other; but each party was to have the exclusive control and management of the premises assigned to him by said agreement, except as therein otherwise provided.

The agreement was to continue in force during the trust, and no action or other proceeding of any kind to obtain any further partition should at any time be prosecuted by either of the parties.

It was made a condition of the said agreement that Livingston should not at any time thereafter, by suit or proceedings at law, or in any other way, interfere with or molest William Winter, or his person or his residence, or attempt in any way, directly or indirectly, to control or influence or direct him in respect to his residence, personal movements or expenditures. And it was mutually covenanted that, except as provided in said agreement, Birdsall and Livingston should not be liable to account to each other of and concerning the rents and profits of said property during the life of William Winter, and that neither Birdsall nor his successor in the trusteeship should be molested or interfered with, by action or otherwise, by said party of the third part, "except to compel due execution and performance" of said agreement.

After this agreement was duly executed and acknowledged by all the parties thereto, and on the same day, a stipulation in writing was entered into, signed by Daniel C. Birdsall, trustee, William Winter, and John Livingston, guardian for infant petitioners, and Samuel G. Courtney, attorney for Birdsall and Winter, by which it was agreed by and between all the parties thereto, *that each and every order made in the matter of the application of said infants by John Livingston, their guardian, for the removal of Daniel C. Birdsall from the office of trustee, be vacated,* and that an order to that

effect might be entered by any of the parties, *and that all the proceedings therein be discontinued,* without costs to any of said parties as against the others, and that an order to that effect might be entered by either party; and that the injunction order granted them on the 8th of August, 1864, be vacated and dissolved.

On the next day, at a Special Term held before Justice LEONARD at the city hall in New York, on filing the stipulation, and on motion of John W. Edmonds for the petitioners, an order was entered in pursuance of the stipulation vacating *each and every order in said proceedings, and discontinuing the said proceedings without costs to any of said parties as against the others,* and dissolving the injunction.

Here the matter rested, and the parties went on under their agreement of October 3d, 1864, until the 12th day of April, 1865, at which time Justice JOSEPH F. BARNARD published his decision; and an order was entered with the clerk of New York, removing Daniel C. Birdsall as trustee of William Winter, and appointing John B. Haskins in his place and stead, upon his filing a bond in the penalty of $20,000, with sureties to be approved by a justice of the Supreme Court.

On the 24th day of April, 1864, John B. Haskins having executed the required bond, applied to Justice GEORGE G. BARNARD for an order requiring Birdsall to account as trustee and pass his account before a referee in the usual manner; upon which occasion the said justice granted an order that said Birdsall show cause before him at the chambers of the Supreme Court in the city hall on the 26th of April, why such an order should not be made. On the 26th of April, the said justice, at a Special Term, granted the order, no one appearing to oppose it; and he further directed that the tenants of the premises in schedule No. 1 account and pay all the rents to said John B. Haskins and attorn to him as such trustee.

On the 8th day of May, 1865, Birdsall applied to Justice SUTHERLAND and obtained an order upon Livingston and John B. Haskins to show cause before the court at a Special

Term, to be held in the city hall on the 15th day of May then instant, why the order of the 12th of April removing him as trustee should not be vacated and set aside, on the ground that the proceedings in said application had been *settled and discontinued;* also why the above order of the 26th of April should not be vacated for the same reason, and in the meantime staying the proceedings of Livingston and Haskins under said orders.

On the next day, May 9th, 1865, John B. Haskins obtained an order from Justice JOSEPH F. BARNARD, dated at Poughkeepsie, requiring Birdsall to show cause before him, at a Special Term to be held at his chambers in Poughkeepsie on the 18th day of May then instant, why the caption of the order of April 12th, removing Birdsall as trustee, should not be amended so as to read the "—— day of the actual making thereof, to wit: the —— day of August, 1864," *nunc pro tunc*, and stand as the order of the court of the last mentioned date. And on the 13th, the said justice, at a Special Term held at the court house in Poughkeepsie, *granted the motion*, and directed the order of April 12th, 1865, to be "amended so that the date thereof shall be entered (*now for then*) as of the last mentioned date, being the day of the rendition of the decision in this matter and of the making of said order." This order was granted on motion of John B. Haskins, no one appearing to oppose it.

On the 27th day of May, 1865, on application of John B. Haskins, Justice SUTHERLAND granted an order on Birdsall, to show cause at a Special Term in the city hall, New York, on the 30th day of May then instant, *why the order of* Justice LEONARD *discontinuing the proceedings,* bearing date October 4th, 1864, should not be *set aside and vacated.*

On the 17th day of June, 1865, Justice SUTHERLAND, at a Special Term, *denied the motion of Birdsall* to vacate the order of the 12th of April, as amended by the subsequent order of May 13th, whereby said Birdsall was removed as trustee. *He also denied the motion to vacate* the order of April 26th, whereby Birdsall was directed to state his accounts as such trustee. And, on the same day, *he granted the*

*motion of Haskins, whereby the order of discontinuance granted by Justice Leonard was directed to be vacated and annulled.* No costs were allowed to either party.

Birdsall and Winter appealed to the General Term from the order of Justice JOSEPH F. BARNARD of April 12th, 1865, removing Birdsall as trustee. Also, from his order of May 13th, 1865, directing his former order to be amended and *entered nunc pro tunc,* as of August 31st. Also, from the two orders of Justice SUTHERLAND of June 17th, 1865, one of which denied the motion to vacate the two orders of Justice J. F. and GEO. G. BARNARD, removing Birdsall as trustee and requiring Birdsall to account to Haskins as the substituted trustee, and *the other of which annulled and vacated the order of discontinuance granted by Justice Leonard.*

All these appeals were heard at the same General Term in New York city, and the orders appealed from *affirmed, with costs.*

Upon the appeal to this court, an application was made at the March Term in behalf of the appellants, for a stay of proceedings pending the appeal, which was granted, with a direction that, in the meantime, *William Winter, the beneficial owner of the rents and profits of the trust estate, be allowed to collect the rents for himself;* and with liberty to the respondents to bring on the appeals for argument at the succeeding June Term.

The nature and character of the evidence upon the application of the Livingstons to remove Birdsall as trustee, together with the circumstances under which a rehearing was granted, and the subsequent orders made, so far as they are material, sufficiently appear in the opinion of the court.

*William F. Allen* and *Alexander S. Johnson,* for the appellants.

*John W. Edmonds,* for the respondent, Livingston.

*John H. Reynolds,* for Haskins.

MORGAN, J.    It is important, to a proper consideration of the several questions presented by these appeals, to understand the position which the respective parties occupy toward each other, and the equity of each to invoke the aid of the courts under the trust deed, for the protection of their respective rights.

This trust deed was voluntary on the part of William Winter, securing to himself the rents, issues and profits of a real estate, confessedly worth $100,000, during his life, with remainder over to his heirs; and on default of heirs, to his nephews Mortimer and Henry W. Livingston.  As he has no children, it may perhaps be assumed that the nephews in question take a vested remainder under our statute; which doubtless gives them a standing in court, to invoke its aid to protect the *corpus* of the estate from destruction by the unlawful acts of the tenant for life.

So far as the deed creates a trust in Birdsall to receive the rents and profits, and apply them to the use of William Winter during his life, it is expressly authorized by statute.  (1 R. S., 728, § 55.)  So far as it requires the trustee to assign or convey the legal estate to those who shall be entitled in remainder under the trust deed, his services will be useless; as the transfer will be made, if at all, by operation of the statute of uses and his office as trustee will then terminate. (1·R. S., 730, § 67.)

As against William Winter, the creator of the trust and the beneficial owner of the rents, issues and profits of the legal estate during his life, the court will not, I think, interfere in behalf of the nephews to give them more than is secured to them by the very terms of the settlement. (Hill on T., 83; *Hayes* v. *Kershaw*, 1 Sandf. Ch., 258.)  Although the deed of settlement is silent on the subject, doubtless those claiming in remainder under it are interested in the management of the estate; and the tenant for life owes them certain duties which a court of equity may enforce.  A tenant for life, in respect to these duties, stands in the nature of a trustee to the remainderman; but this is an *implied* and not an *express* trust. (*Joyce* v. *Gunnels*, 2 Rich. Eq., 260.)

If the tenant for life is guilty of any species of waste, calculated materially to injure or destroy the value of the estate in remainder, it is perfectly competent, and, in truth, is the constant practice in this country, as well as England, for the remainderman to resort to the prompt and efficacious remedy by an *injunction bill.* (4 Kent, 77.) Upon such a bill a court of equity might require security of the trustee for the due performance of those duties which the law casts upon him in respect to the preservation of the *corpus* of the trust estate.

Since it has become impossible, under our statutes (1 R. S., 730, § 65), for the trustee in such a case to alien or dispose of the real estate to the injury of the remainderman, there are but few occasions when it can be necessary or proper for the court to interfere with the management of the trust, except on behalf of the beneficial owner for life.

In this case, William Winter, the creator of the trust deed, is the only person who is legally interested in the execution of the *express trusts* therein mentioned. *There are no express trusts in favor of the petitioners.* The obligation on the part of the trustee to preserve the *corpus* of the estate for the benefit of those entitled in remainder, does not rest upon any *express trusts,* but is to be *implied,* if it exists at all.

Keeping in view the relations which these several persons sustain toward each other, I will now proceed to notice the several questions presented by the appeals.

I. It will be seen that William Winter, the equitable owner of the estate for life, and who alone is interested in the execution of the trusts mentioned in the deed of trust, is a *party defendant* in these proceedings. I am not aware of any case where the court has entertained a petition for the removal of a trustee under our statutes at the instance of those entitled in remainder and against the wishes of the *cestui que trust* for life. Nor do I think the statute intended to authorize such a proceeding. Section 55 (1 R. S., 728) authorizes the creation of an express trust " to receive the rents and profits of lands, and apply them to the use of any persons during the life of such person." This is such a trust.

Section 70, taken in connection with section 72, provides that upon the bill or petition of any person *interested* in the execution of an *express* trust theretofore authorized, the Court of Chancery may remove any trustee who shall have violated or threatened to violate his trust, or who shall be insolvent, or who shall, for any cause, be deemed an unsuitable person to execute the trust.

It was said by the chancellor, in the matter of *Van Wyck* (1 Barb. Ch., 565), that, independently of these statutory provisions, the court had no power upon a mere petition to discharge a trustee, and that the usual course of proceedings was by bill. (Hill on T., 194.)

As a general rule, petitions can only be presented in an action already commenced, or in a matter over which the court has jurisdiction by some act of the legislature or other special authority. Under the English statutes sundry cases of trust were provided for, in which a remedy might be had by petition; but the courts uniformly held that the remedy could not be extended by construction to include other cases. In *ex parte Brown* (Cooper, 295), Lord ELDON discharged an order that had been made upon petition, stating that, in his opinion, *constructive* trusts were not within the meaning of the statute. And in *ex parte Skinner* (2 Mer., 453), it was held that the statute was meant to extend only to cases of plain breach of trust, committed in their character as trustees. (And see Hill on T., 193, 3 Dan. Ch. Pl. & Pr., 2099.)

It is quite certain that our statutes, authorizing persons interested in the execution of express trusts to apply for the removal of the trustee on petition, were only intended to embrace that class of persons who were immediately interested and who might be injured by a violation of the trust, or by the insolvency or other incompetency of the trustee.

In this case I think William Winter was the only person interested in the execution of the trust, within the meaning of the statute, and that it was erroneous for the court below to entertain a petition for the removal of Birdsall from the trust, except upon the application of Winter.

It does not, however, appear that the appellants took any

objection of this character.   Perhaps they should have moved
to dismiss the petition in order to avail themselves of the
objection; and it may be too late, after litigating the petition
upon the merits, to raise such a question.   If, however, the
court below was without jurisdiction in the first instance, as
I am inclined to believe, I think it is not too late to raise the
objection, although it is well settled that a stranger could not
avail himself of it. (*People* v. *Norton*, 9 N. Y., 176.)

II.   If it should be conceded that the proceedings by
petition were regular, or that jurisdiction was acquired in
consequence of the appellants neglecting to take the objec-
tion in time, then it will be necessary to examine into the
matter of the petition before we are prepared to pass upon
the other questions raised by the appeal.   It contains a great
many things which are quite foreign to the matter in hand,
and many of its most important statements rest upon inform-
ation and suspicion.   It contains, however, one statement,
which, if sustained by the evidence (and I am not prepared
to say that it is not), would induce the court to refuse at
once to entertain any proceedings to give effect to the trust
deed in favor of these respondents, or any other of the par-
ties claiming under it.

It is said in the petition that William Winter was incom-
petent to devise real estate.   This is stated by Mr. Livingston
in his letter to Judge EDMONDS but a few days before the
execution of the trust deed.   The petitioners also say, " that
said William Winter being a person of very weak under-
standing, incapable of transacting business or managing his
own affairs, so credulous as to believe the most improbable and
absurd statements, and so timid as to be easily frightened
into almost any course of action that might be suggested to
him, easily alarmed and imposed upon by any designing per-
son, said Birdsall has taken advantage of William's weakness
of mind and character, and of his (Birdsall's) own relations
as such attorney and trustee toward him, for the purpose of
defrauding, deceiving and misleading him; *that, at the time
the execution of said trust deed of December* 23, 1863, *was
obtained by Birdsall,* * * *    and for more than a month*

*prior thereto,* he had been acting not only as the agent, attorney and counsel of William, but as his guardian and custodian; that said Birdsall has abused the confidence reposed in him by William solely for his own gain and advantage; that by falsehood, trickery and deceit he has induced and compelled William to avoid all communication with and keep away from his own relatives, acquaintances and other advisers, whilst by like fabrications and false statements, he has prevented such relatives from calling upon William, he (Birdsall) keeping himself in communication with and deceiving both parties ;   *   *   *   *that the execution of said trust deed was procured by Birdsall through fraud and deceit practiced by him upon said William,* and upon said Livingston and his counsel.

Gilead P. Nash (Livingston's partner), on his affidavit annexed to the petition, says, that he " never had any doubt of the fact that said William is a person of unsound mind."

It appears that Livingston himself proposed that Winter should execute a deed of trust, although he preferred somebody besides Birdsall for trustee. He finally consented to have Birdsall's name put in. This, however, says Mr. Nash, was " a matter of necessity; for Mr. Birdsall repeatedly stated, both to me and Livingston, that he would not allow William to execute the deed unless it should be made to him."

William Winter, however, in his affidavit, states that he executed the trust deed without any compulsion, fraud, duress, threats or misrepresentations of any kind upon the part of Birdsall or any other person, and that he is still satisfied with it and with Birdsall as his trustee; that he selected Birdsall by his own choice, although Birdsall at the time informed him that he was, comparatively speaking, a poor man ; that he made inquiries as to Birdsall's character and integrity, and became satisfied, and is still satisfied, that Birdsall will carry out the said trust deed with faithfulness and honesty. He further states that he executed the said trust deed " believing it to be the best thing he could do to get away and be relieved from the annoyances and harassings

of said Livingston, and believing thereby he could have the quiet and rest from vexation he so much desired to have and desires."

Mr. Birdsall, in his affidavit, states that Livingston urged him to advise William Winter to make a trust deed ; that Livingston offered him $2,000 for his trouble if he would get him to execute such an.instrument as he (Livingston) had prepared for him ; that Livingston said he did not offer it as a bribe, but that William Winter was very close, and would not pay him (Birdsall) for his services. Birdsall says he declined this proposition. He says that Livingston told him frequently that he.(Birdsall) ought to make from $2,000 to $3,000 a year out of the trust, and that he (Livingston) would not take charge of it for less than that sum ; that in the month of May, 1864, Livingston stated to him that it would be impossible for Birdsall and Livingston to get along together, and it would be better for all parties for Birdsall to resign his trust; that Livingston offered him $5,000 if he would resign, and $5,000 more if he (Birdsall) would get him (Livingston), or some person he (Livingston) would select, appointed trustee, the moment the order for such appointment was entered. Birdsall says he declined, where-upon Livingston got angry and swore he would have him removed whatever it might cost. Mr. Livingston, in a sub-sequent affidavit, denies that he ever made any offers of the kind.

The case tends very strongly to show that the deed of trust was obtained by fraud and undue influence, both Liv-ingston and Birdsall coöperating together to induce William Winter to execute it ; and as it is expressly charged in the petition that Winter was of unsound mind when it was exe-cuted, and that the deed was obtained from him by fraud and undue influence, it was clearly the duty of the court below to dismiss the petition, unless the judge was fully satisfied that the trust deed was the voluntary act of a sane man, competent to make it. A court of equity will never inter-fere in favor of a party who takes under an instrument executed by a person who is *non compos*, or when executed

under duress, or under terror or apprehension, nor suffer them to take effect if they are accompanied by any circumstances of imposition or apprehension. (See Hill on Trustees, 156, *et seq.*)

In order, therefore, to sustain the orders made for the removal of Birdsall as trustee, and the appointment of Haskins to carry out the trusts, the petitioners must, of necessity, concede that *William Winter was not only competent to make the deed of trust, but that it was fairly and voluntarily made*, when he was neither under duress or restraint. Otherwise, the court would doubtless set it aside on complaint of William Winter, or of his committee.

III. Assuming, however, that William Winter was competent to create the trust, and that the deed is valid, there is but little left in the case, as made out by the petitioners, upon which to found an order for the removal of Birdsall as trustee. In my opinion, the court ought not to remove him against the wishes of William Winter, who has an undoubted right to give away the rents and profits of the trust estate to whom he pleases, without interference from the petitioners. He may, if he pleases, pay Birdsall's debts out of these same rents and profits; and it is not for Livingston to prevent him from doing so. But it is claimed that William Winter is liable to be imposed upon; that he is an imbecile, and incompetent to manage for himself. Without undertaking to deny that this may be, in a measure, true, what is the result? It does not advance the case of the petitioners, or aid in sustaining the proceedings in the court below. If the court erred in affirming the verdict of the jury, upon the *commission de lunatico inquirendo*, that error cannot be corrected in these proceedings. From the nature of the evidence tending to establish the lunacy of William Winter, there is no doubt that, if he is now incompetent to manage his own affairs, he was equally so when he made the deed of trust; and this would lead to a result quite foreign to the expectations of the petitioners, who claim under it, as we have already had occasion to notice.

Now, whether Birdsall is insolvent or not, whether he is

using a portion of the rents and profits for his own benefit, and to pay his debts, in order to relieve himself from insolvency, is a question between him and William Winter, and the creditors of William Winter.   When the petitioners state that William Winter's debts are accumulating upon him by the negligence and dishonesty of the trustee, they are interfering with a matter over which they have no control whatever.   It will be time enough for Livingston to make such complaint when he is constituted one of the committee of the person and estate of William Winter; and, until that time arrives, he has no claim upon the court to interfere with William Winter or his trustee.   As yet, William Winter has not been pronounced a lunatic or a person of unsound mind, by the judgment of a competent court, and we must, therefore, concede to him the same right we concede to others who are the owners of a large estate — the right to *dispose of it* by gift, grant or devise, to whomsoever he pleases, without being called to account for it in a court of equity by those who have no legal control over him or his estate.

In my opinion, therefore, the order or decree of Justice LEONARD of July 1st, 1864, denying the application of the petitioners, was right; first, upon the ground that the petitioners had no right to apply by petition for Birdsall's removal as trustee; and, secondly, *upon the merits.*

As the *rehearing*, before Justice JOSEPH F. BARNARD, was substantially upon the same state of facts, it may not be necessary to proceed any further in the discussion of these appeals, as we must necessarily come to the conclusion that the subsequent decree, removing Birdsall as trustee and the appointment of Haskins in his place, cannot be sustained upon any theory of the case.

IV. As this is, however, a very extraordinary case, I will proceed to notice the proceedings subsequent to the decree of Justice LEONARD dismissing the petition.   The very statement of the case, with the various orders made by the various judges during its progress to this court, is sufficient to attract our attention and create some suspicions, at least, that the

forms of law have been strangely perverted to accomplish objects which could not have been attained by the regular and orderly administration of justice.

(1.) I will first notice the order for a rehearing granted by Justice GEORGE G. BARNARD at Special Term. It is called an order *granting leave to the petitioners to renew their application;* but it is doubtless an order for a *rehearing* of the petition upon the merits. With respect to applications made in an action, they may doubtless be made by petition as well as by motion; and the practice is the same, whichever form the application takes. (1 Barb. Ch. Pr., 578.)

In relation to special proceedings authorized by the Code, when the remedy may be had by petition under section 1, the rules governing ordinary motions do not apply; but instead of obtaining leave to renew the application, the defeated party was required, by the former practice of the court, to apply for a rehearing in the same manner as upon a decree or decretal order. (1 Barb. Ch. Pr., 353.) An order, made upon motion, was not a proper subject for rehearing, but might be discharged by application by motion to the court. But if the order of Justice G. G. BARNARD is treated as an order made on motion, I think it was made in violation of the practice of the court; and certainly in violation of rule 23 of the Supreme Court, which prohibits a second application upon the same state of facts to be made to any other judge than the one who decided the original application.

2. It is, at least, questionable whether a rehearing upon the merits can be granted, since the Code of Procedure, except upon an appeal to the General Term. Doubtless the court at Special Term may, at any time within a year, relieve the party from a judgment, order, or other proceedings taken against him through his mistake, inadvertence, surprise or excusable neglect, upon terms, or grant a new trial in the cases provided for in civil actions, according to the rules and practice of the court. But there is no provision in the Code, that I am aware of, where the trial is by the court, which authorizes an application to the court at Special Term for a new trial upon the merits. It may be said, however, that,

by another provision of the Code, in cases left unprovided for, the former practice may be resorted to. (§ 468.) Certainly the Code has not attempted to regulate the practice in special proceedings, except upon appeals.    By the Laws of 1854, p. 592, certain provisions of the Code are made applicable to special proceedings.    That act provides that an appeal may be taken to the General Term from the final order of the Special Term in special proceedings, and that the practice on such appeals shall be conformed to §§ 327, 329, 330 and 332 of the Code.    By reference to these sections, it will be seen that the appellate court may, upon such appeal, reverse, affirm or *modify* the order appealed from, and may order a *new trial.* It is doubtful, I think, whether the court at Special Term can entertain an application for a new trial upon the merits, as that power seems to be vested in the court at General Term.

V. But, if the former practice is still in force in respect to rehearings in equity in this State, I am of the opinion that the court below erred in granting a rehearing in this case. 1. It was not a case for a rehearing.    A rehearing will not be granted on account of the discovery of new evidence or new matter, nor because the importance of the testimony has only been ascertained since the decision, nor to obtain cumulative testimony, nor for the purpose of contradicting the adverse party's witnesses. (1 Barb. Ch. Pr., 354, 355, and cases cited.) Certainly the power to grant a rehearing cannot be arbitrarily exercised; and, if the judge grants it upon insufficient grounds, it is an error which should be and will be corrected by the appellate court whenever the question is properly brought before it for review.

2. But, in my opinion, there is another grave objection to the order of Justice BARNARD, granting a rehearing of the petition, except before the same judge who denied the original application.    Chancellor WALWORTH, in *Winship* v. *Pitts* (3 Paige, 260), says that, after an application has been made to the vice-chancellor in open court, and been denied by him, it is irregular to bring the same question before the chancellor, except by way of appeal; and, after a decree had been made by the chancellor, it is not competent for any vice-chancellor

to make an order or decree which would, directly or indirectly, discharge, alter or modify the same. (*Greenwich Bank* v. *Loomis*, 2 Sandf. Ch., 70.) Nor will one vice-chancellor modify or interfere with a decree made before another vice-chancellor. (*Astor* v. *Ward*, 3 Ed. Ch., 371.)

So in England; a cause heard before the chancellor may be reheard before the chancellor or his successor in office. If it has been heard before any of the other judges, it may be reheard before the judge who heard it before, or before the lord chancellor, in which case it is generally termed an appeal, although, in fact, it is only a rehearing. When the statute (5 Vic., ch. 5) created two additional vice-chancellors, it was made one of the provisions of the act, that one vice-chancellor could not *rehear* any matter in which an order or decree had been made by another vice-chancellor. (3 Dan. Ch. Pl. & Pr., 1617, 1618.)

Although we have no statute which expressly prohibits one judge from rehearing a matter decided by another judge, the rule is so well established and is so important for the protection of parties from unjust vexation, that if it has not already been, it is full time it should be incorporated into the equity law of this State.

3. But there is another ground upon which it cannot be permitted; and that is the doctrine of *res adjudicata*. We have tribunals to whom parties may appeal from an erroneous decision made by a judge at Special Term; and if parties conceive themselves aggrieved by the decree of one judge, they must take their remedy by appeal, instead of applying to another judge to rehear their complaints.

VI. I will now examine into the validity of the orders made by Justice J. F. BARNARD upon the rehearing by which Haskins was substituted trustee in the place of Birdsall, as well as the subsequent orders made to carry that order into effect. If, as I have already attempted to show, the order of Justice LEONARD was right, it follows that the subsequent order of Justice BARNARD cannot be sustained; for it was made upon substantially the same state of facts. But it is unnecessary to rest the case here; *for pending these proceed-*

*ings before Justice* J. F. BARNARD *upon the ·rehearing, the parties entered into a valid and binding agreement by which the controversy was settled;* · a settlement which was clearly just and advantageous to all the parties. This settlement, if the trust is valid, ought to receive the sanction of a court of equity, and should be enforced against all the parties.

It was suggested on the argument, that the settlement was not binding upon the petitioners because they are infants; but a court of equity will enforce it if it is made for their benefit, as this clearly was. (*Rogers* v. *Cruger,* 7 Johns., 557; *Savil's Case,* Moseley, 224.) It was, therefore, .right and proper that the proceedings should be discontinued, as they were, by an order of the Supreme Court at Special Term upon the stipulation of all the parties. This order was made before Justice LEONARD upon the basis of the settlement, and it in terms vacated all the orders which had been theretofore entered in the proceedings.

·Notwithstanding the settlement and a formal discontinuance of the proceedings, Justice JOSEPH F. BARNARD, subsequent thereto and on the 12th of April, 1865, made an order on the rehearing, removing Birdsall as trustee and appointing John B. Haskins in his place. On application of Mr. Haskins, he afterward made another order, at Poughkeepsie, directing his order of the 12th of April, 1865, to be entered as of the 31st of August, 1864. It is not to be disguised that the object of this last order was to overreach the settlement. It was founded upon the affidavits of Mr. Haskins and the clerk of the court. Mr. Haskins swore that he had the original memorandum order of Justice BARNARD, as follows : " The —— day of ——, 1864," and that " the erasure of figure four in the year, and the insertion of April 12th, 1865, was an error of the clerk, and such order should be corrected and entered as of August or September, 1864." The clerk swore that about a week or two after the rehearing, in August, the papers came to him from Justice BARNARD by express ; and that subsequently he received the decision written on some of the affidavits and on the motion, which was found in the judge's private room. He also swore that

the papers were received and said order made as early as August, 1864. That all this was substantially false in every important particular, plainly appears by the affidavits of the clerk and others, subsequently made and used upon the motion of Birdsall to set aside the order. The clerk then swore that the order of the 12th of April, 1865, *was on that day given to him by Justice George G. Barnard;* on which day he filed all of the papers in this matter, together with said order, and marked the whole of them; and that he received the *memorandum of the decision before referred to, subsequent thereto and several days thereafter;* that he did not find it in the judge's private room, *but the same was handed to him in the latter part of April.* He further says that his former affidavit was made under a misapprehension. But this is not all. Birdsall states in his affidavit, and in this he is corroborated by Herman Fox, that on the 18th of April, 1865, he examined the papers on file, and *the memorandum in question was not then on the paper* on which it was subsequently found to be indorsed. These facts were not contradicted before Justice SUTHERLAND on the part of Haskins or Livingston. I think, therefore, it is quite apparent that the order of Justice JOSEPH F. BARNARD, antedating his order of removal to August 31st, 1864, was made under an entire misapprehension of the facts.

But whether the order was fraudulently obtained or not, the fact is put beyond doubt by the affidavit of the clerk, *that no order was published* by Justice JOSEPH F. BARNARD removing Birdsall as trustee, until the 12th of April, 1865. It could not take effect prior to that time by force of another order made afterward.

There is another order which claims our attention, granted upon the motion of Mr. Haskins by Justice SUTHERLAND at Special Term, setting aside the order of Justice LEONARD already referred to, discontinuing the proceedings. This order was made at the same time that the judge denied the motion to set aside the order of April 12, for the reason, doubtless, that it was regarded as an obstacle in the way of Haskins getting possession of the trust property under the

order of April 12th. The reasons of Justice SUTHERLAND for setting aside the settlement of October 3, 1864, are not given in the case; but the grounds upon which the application was made deserve attention. Mr. Haskins states in his affidavit that Birdsall pretended that the proceedings in the matter of the petition were discontinued, but that " as he is informed by Livingston and verily believes to be true, the said Birdsall obtained his signature to the said stipulation and agreement of the 3d of October, by falsely and fraudulently pretending and representing to said Livingston that the motion argued herein for said Birdsall's removal on the 23d, 24th and 25th days of August, before the Hon. J. F. BARNARD had been denied, and by other false representations and pretenses." Birdsall, however, in his affidavit denies this, and states further that " on the 30th day of May he called on Livingston and showed him Haskins' affidavit, and that Livingston then told him that all of said affidavit in relation to what Haskins alleges was said to him by Livingston as herein referred to is false and untrue." Mr. Livingston did not make an affidavit in the matter, but it appeared by the affidavits of Mr. Courtney, as well as that of Mr. Birdsall, that the settlement was fairly made by the mutual consent of all the parties interested. Surely the court would not set aside the settlement and stipulation for fraud, when the party who is alleged to have been defrauded does not complain of it.

There are many other things, which might be noticed, tending to reflect upon the character of the proceedings under review, but the facts already referred to are sufficient, I think, to enable the court to dispose of these appeals.

VII. It is claimed, however, that no appeal will lie in this case, or that, at least, this court will not review the order removing Birdsall as trustee, as it rests in the discretion of the Supreme Court, and is not subject to review in this court.

As I have already stated, an appeal is given by the Laws of 1854, p. 592, § 1. By section 330 of the Code, which is made applicable to such appeals, this court may reverse, affirm or modify the order appealed from, and may order a

new trial.  The orders appealed from also affect a substantial right made in a special proceeding under section 1 of the Code, and for that reason are appealable as such to this court. (*Hyatt* v. *Seely*, 11 N. Y., 52.)

No provision having been made by the Code for a finding of facts in such a case, this court is necessarily required to examine the affidavits and evidence upon which the case was decided.  An unrestricted appeal takes along with it the whole merits of the determination appealed from. (*Bates* v. *Voorhees*, 20 N. Y., 528.)

It may be true, as was said in *Rogers* v. *Hosack,* ex'r (18 Wend., 329, 330), that the Court of Appeals will not interfere to regulate the discretion of a court of equity, when the statute has vested that court with power to remove a trustee for a particular cause; but I think such a principle is not applicable to this case.

Upon the application of William Winter to remove Birdsall for insolvency, the evidence in this case is such that this court would not feel authorized to interfere with the decision of the court, whatever its determination might be; but when the court undertakes to act upon the application of third persons claiming. in remainder, who have no immediate interest in Birdsall's insolvency, the question assumes another aspect.  And when one judge overrules the decision of another judge, under pretext of a rehearing, upon substantially the same state of facts, it involves a principle which affects the administration of justice in this State, and presents a question eminently proper to come before this court for review.

And so in reference to the orders made subsequent thereto by which a valid settlement and final discontinuance of the proceedings were avoided upon grounds which were not only false in fact, but insufficient in substance.

Although no appeal was taken from the order of Justice G. G. BARNARD ordering a rehearing of the petition, it is necessarily connected with the final order of Justice J. F. BARNARD upon such rehearing, which in effect reversed the previous order of Justice LEONARD; and its validity is doubt-

less involved in the principal appeal from the final order of Justice J. F. BARNARD, removing Birdsall as trustee and appointing Haskins in his place.

I have no doubt as to our power to examine the whole case upon the merits, and to make such order in the premises as we shall deem suitable and proper in view of all the circumstances. This being a proceeding in equity, we may not only reverse, but, if necessary, make such final order or decree in the premises as justice may require. (2 R. S., 167, § 27; Laws of 1847, ch. 280, § 8; *Le Guer* v. *Gouverneur*, 1 Johns. Ca., 436, 499; *Forest* v. *Forest*, 25 N. Y., 501.)

I have already said enough as to the character of these proceedings to justify us in reversing the orders appealed from, on account of their departure from the rules and practice of the court. These rules of practice have been established to protect the rights of parties and constitute a part of the equitable jurisprudence of this as well as every other civilized country.

But if we look only at the merits of the case, it is impossible to sustain the proceedings. No reason can be assigned for superseding the deed of settlement of October 3, 1864. If the trust deed is to stand, there could be no more proper arrangement made for securing the rights of all the parties and the preservation of the *trust estate.* If we lay out of view the insufficiency of the evidence upon which the deed of settlement was overreached by the order of Justice SUTHERLAND, there is no ground upon which the court could properly make such an order upon the motion of Mr. Haskins. He had no interest whatever in the original controversy; and his subsequent appointment as trustee did not give him any standing in court to interfere with the prior proceedings. He was merely a volunteer, and yet we find that the court acted solely upon his motion in granting the application, which in effect overreached a settlement of the entire controversy mutually beneficial and satisfactory to all the parties.

I would, therefore, advise that all the orders appealed from be reversed, and that the order of Justice LEONARD, made at

Special Term, October 4th, 1864, by which the proceedings were discontinued without costs to either party, be affirmed. This will leave the parties to go on under the deed of settlement made and signed by all the parties October 3d, 1864.

Although the case furnishes strong grounds for setting aside the trust deed, that question is not properly before us. As to the costs, we may award them at our own discretion. (Laws of 1854, p. 592, § 3.) I think the respondents should be charged with the costs of all the proceedings taken by them after the settlement of October 3d, 1864, together with the costs of the appeals in this court.

All concur in the disposition to be made of this case as recommended by MORGAN, J.