Belmont *v.* Erie Railway Company.

————————•◆•————————

## AUGUST BELMONT *vs.* THE ERIE RAILWAY COMPANY and others.

An interlocutory motion may, upon application to the court, be opened and heard anew, if the court, in its discretion, thinks, sufficient reason exists therefor. And if it be found to be required by law and justice, the court has power to vacate the order previously entered, and declare that a party is not entitled to the relief obtained thereby, and deny the motion for that relief.

It is well settled that whatever can be done upon motion to the court may, by the court, upon further motion by either party, be altered, modified or wholly undone.

Whether it be the party whose motion was denied, or the party moved against who asks the favor, if proper cause exists, the practice is the same. In either case the order previously entered is "*opened,*" or vacated, and the matter heard anew, precisely as if it had never been argued before, and as if the principal or original motion, on all the papers then presented, had then, for the first time, been made.

The decision of the court upon a motion, is not *res adjudicata.*

But in order that mere litigiousness should not be encouraged or permitted, the practice of the courts has been established to be that after a motion has been once fully heard and decided, it shall not be revived again, except upon leave of the court first had and obtained, or unless a different state of facts has arisen since the first determination.

When a different state of facts has arisen since the first motion, a new motion, based upon these facts, may be made, as a matter of right. But when that is not the ground, leave must be obtained, from the court, which may grant it either upon additional facts and papers, or upon the same papers originally before the court.

It is no objection to an application to open a previous motion, that it is made before a different judge from the one before whom the original order was made. Both orders are properly the acts of the same court—the special term—and not of the judges.

Belmont *v.* Erie Railway Company.

Nor will the fact that an appeal from the order granted on the former motion has been taken, prevent an application to open such motion from being entertained.

Where a party, upon such an application, shows material facts which were not presented to the court upon the previous motion, and that he was, so far as such matters then existed, prevented from bringing them to the notice of the judge by mistake, inadvertance, surprise, or excusable neglect, this presents such a case as will justify the granting of a motion to open the rule taken against him.

To enable a stockholder in a corporation to maintain an action to restrain the directors from the exercise of their corporate powers, and for the appointment of a receiver, the risk and responsibility must be upon him; so as to afford a guaranty that he is acting for the benefit, or what he believes to be for the benefit, of the company. If it appears that other persons, whose interests are hostile to those of the company, have agreed with the plaintiff to bear and pay the expenses of the litigation, any relief, especially upon an interlocutory motion, will be refused.

Although a stockholder of an incorporated company may have an injunction to restrain illegal acts of the directors, and in certain cases he may have a receiver appointed of a particular fund, the proceeds of an unlawful act; yet where the complaint makes no case for any partial receivership, but, while neither charging insolvency, nor asking to dissolve and wind up the company, prays that " a receiver may be appointed of all and singular the funds and books and papers and rights of action of such company," the court is not authorized to appoint a receiver, the effect of which would be to remove all the directors.

A court of equity has no visitorial power over corporations, except such as may be expressly conferred on it by statute.

An action will not lie in behalf of a stockholder in a corporation, against the corporation and its directors, to remove the directors and appoint a receiver of all the property, rights of action and records of the company, and for an injunction, upon allegations of misconduct in a·part of the directors only, in which the others are not charged with participating, except that they are under the influence of the former.

The misconduct of some, or even of all the directors, affords no ground for taking away the rights of the stockholders who constitute the company, either by dissolving the corporation, or taking away its management and placing it in the hands of an officer of the court.

The directors of a railroad corporation, acting in good faith, have power to issue convertible bonds in the name of the corporation, for the amounts they may borrow to complete and finish, or to operate the road, with the right to authorize their conversion into stock; although it increases the amount of capital stock beyond that fixed by the charter. And that being so, the right of the directors to issue stock in conversion of such bonds, is clear.

If the court were satisfied, however, that bonds were about to be issued, by

Belmont *v.* Erie Railway Company.

the directors of a corporation, not for the payment of money actually borrowed for the purposes authorized by the charter, but as a part of a fraudulent device to increase the stock, the issuing of them might be restrained by injunction.

So, while the bonds remain in the hands of any persons affected with notice that they do not represent a *bona fide* indebtedness, but were issued with such fraudulent design, the issuing of stock in conversion of them may also be enjoined.

THIS is an action brought by the plaintiffs, as stockholders of the Erie Railway Company, against that company, and all its directors, seventeen in number, seeking: 1. To remove those directors, and appoint a receiver of all the property, rights of action, and records of the company. 2. To restrain the defendants from increasing the capital, or removing the property or records beyond the jurisdiction, or preventing the *other* directors from examining the books, or permitting the funds of the company to remain out of the jurisdiction, or using the funds, except in payment of the legitimate debts and expenses of the company. This complaint made certain allegations of misconduct against Messrs. Gould, Fisk and Lane, three of the directors, but did not charge the other directors with participation in it, except that they were too much under the influence of the three. Upon this complaint, with the common verification and four affidavits, and upon the papers in another action brought by one McIntosh, the court appointed Hon. Henry E. Davies, "receiver of the railroad and franchises, and property, real and personal, funds, assets, moneys, securities, books, papers, and effects and leases of the Erie Railway Company," and by a subsequent order, defining the powers of the receiver, conferred upon him authority to operate the Erie railway and all other railroads and ferries which the Erie Railway Company was by law authorized to operate. A motion was now made by the defendants to open the order appointing a receiver, and for leave to them to introduce new proofs and to have the motion heard anew, upon the grounds that the

defendants had not a sufficient opportunity to meet the moving papers by affidavits on their part, and that they were taken by surprise in the refusal of the court to give them time for that purpose. The defendants alleged that if they had had time they would have produced the affidavits which they now produce, and from which it would have appeared that the charges of misconduct were amply repelled.

*A. J. Vanderpoel, C. A. Seward, John E. Burrill, W. Fullerton, E. W. Stoughton, J. S. Bosworth, John K. Porter* and *D. D. Field,* for the defendants, in support of the motion.

*C. A. Rapallo, S. L. M. Barlow* and *W. W. McFarland,* for the plaintiffs, and in opposition to the motion.

*H. E. Davies,* receiver in person, and *Noah Davis,* for receiver.

CARDOZO, J. This matter comes before the court upon an application to open an order made at special term, to allow the defendants to introduce proofs, which they could not produce when the motion, which resulted in that order, was heard, and thereupon to hear the motion anew; and, if found to be required by law and justice, to vacate the order previously entered, and declaring that the plaintiffs are not entitled to the relief they obtained, to deny their motion for that relief.

It is a very ordinary proceeding, constantly occurring, and never before, so far as the books show, or as I have ever heard, occasioning any unusual excitement. It is the invoking of a jurisdiction which has been exercised by the courts, undoubted and unquestioned, until now, for such a length of time that " the memory of man runneth not to the contrary."

But that the power was upon the argument disputed,

Belmont *v.* Erie Railway Company.

and apparently with sincerity by most reputable counsel, I should scarcely have deemed it necessary to vindicate by authority a rule of practice which, I have no doubt, in one form or other is acted upon by every judge, probably many times during each term at which he presides at chambers. Most certainly I should have thought it quite enough to have barely alluded to the elaborate opinion of Chief Justice ROBERTSON, in the case of *Smith* v. *Spalding*, (3 *Rob.* 615,) hereafter mentioned.

But the question has been raised; much time devoted to its argument, and therefore, perhaps, it will be wise to spend a little more time in examining the subject, so that by reviewing the authorities, the doubt now attempted to be cast upon this most important power may be forever set at rest. I call it a most important power, because, if the position assumed be true, that when a motion has been once heard, and decided, there is no remedy against the order made, except that which an appeal will afford, then it will be found that the most flagrant injustice may often happen, without the possibility of the sufferer obtaining any redress. For instance, suppose that upon the papers presented to the court the decision at special term was clearly right, and must be affirmed on appeal, and yet there were facts which, had the defeated party known them, or had he had an opportunity of exhibiting them to the court, would have inevitably produced a different result. Can it be that he is remediless? An appeal will not aid him, for that must be heard upon the papers on which the motion was decided, and I am supposing the case of a motion correctly decided upon the papers as they stood before the special term. On this subject, Judge CLERKE, in *White* v. *Munroe*, (33 *Barb.* 654,) in general term, composed of himself and Judges SUTHERLAND and ALLEN, says: " A grievous wrong may be committed by some misapprehension or inadvertence of the judge, for which there

VOL. LII. 41

would be no redress, if this power did not exist." It is not necessary to multiply instances by way of illustrating the monstrous effects which would flow from the doctrine asserted by the plaintiffs. To guard against such results, the courts very early laid down the rule that the principle of *res adjudicata,* which prevents a matter being twice litigated, has no application to a mere interlocutory motion. So, in 1823, in *Van Rensselaer* v. *Sheriff of Albany,* (1 *Cowen,* 501,) which was a motion to compel the sheriff to execute a deed, Chief Justice Savage, as the ground of his assent to the granting of the motion said : " Our decision is not *res adjudicata."* (*See also Simson* v. *Hart, decided in* 1816, 14 *John.* 75, *quoted infra.*) Again in the case of *Snyder* v. *White,* (6 *How. Pr.* 321,) Justice WELLES says : "I do not regard the decision of the circuit court as at all in the way of the present application. *The decision of a motion is never regarded in the light of res adjudicata."*

But so that mere litigiousness should not be encouraged or permitted, the practice of the courts, has been established to be that after a motion has once been fully heard and decided, it should not be revived again, except upon leave of the court first had and obtained, or unless a different state of facts arose subsequently to the first determination. When a different state of facts has arisen since the first motion, a new motion, based upon these facts, may be made as a matter of right. A notable example of this is the case of *The People, ex rel. Barry,* v. *Mercein,* (3 *Hill,* 399.) But when that is not the ground, leave must be obtained from the court, which may grant it either upon additional facts and papers, or, though of course more rarely done, upon the same papers originally before the court. This statement of the practice will be found to be fully supported by the cases which I shall hereafter mention.

But it is claimed that however the practice may have been, the present rule, (twenty-third of the court,) which

was adopted in 1858, is a bar to this application. To this it is to be answered, 1st. That that rule has no application in any aspect of it, unless, which is not the case here, the former and the present ,motion were made upon precisely the same state of facts. Such are the express words of the rule. But beyond this, it has been held, since that rule was adopted, that the court could grant leave to renew upon the same facts upon which the previous motion was denied. This was decided at special term in November, 1860, and affirmed at the general term in February, 1861, in the case of *White* v. *Munroe,* to which I before adverted. The court, through Mr. Justice CLERKE, said: " It is entirely in the discretion of a court to hear a renewal of a motion or not. *They can, as they may deem advisable, hear it on precisely the same papers."*

But the truth is, the twenty-third rule of the court has nothing to do with the matter. Indeed, it is manifest, and so it has always been understood, that that rule relates exclusively to *ex parte* applications made out of court to " a judge or justice " upon affidavits; and so the rule provides that upon making to a *judge* or *justice* an application for an order, in the affidavit upon which the order is asked, the party shall state whether any previous application for such order has been made to any other *judge* or *justice.* But a motion, upon notice, to open an order is not addressed or presented to the judge. It is an application to the court.

It remains, therefore, to refer to some other authorities to see whether I have stated correctly what I understand to be the long existing practice. Among the earliest cases which have fallen under my observation, bearing upon the right of the court to reopen a motion once heard and decided, is *Davies* v. *Cottle,* decided in 1789, in the King's Bench, (3 *Term. Rep.* 405.) It is true that, in that case, the application was denied, but I cite it because though the court, for the reasons it assigned, refused to exercise

it, the power to reopen the matter was recognized, even at that early day. In Trinity term, 1789, the defendant obtained a rule to show cause why there should not be the like judgment as in case of nonsuit, on an affidavit which stated, in the usual form, that the plaintiff had not pro-. ceeded to trial after having given notice of trial in the regular course. Cause was shown by affidavit, disclosing an agreement between the parties, made after the notice of trial, to discontinue the action on the defendants paying the plaintiffs twelve guineas, and upon that the rule was discharged. Thus it will be seen that the motion, founded upon the rule, was litigated and denied. In Michaelmas term of the same year, (1789,) the defendant moved to discharge the rule denying his former motion, upon three affidavits disproving the affidavit previously read by the plaintiff. The court, per Lord Kenyon, chief justice, refused the motion, saying that the ground assigned was "not sufficient to induce the court to open the matter again, *as the only object of it was costs.*" Nobody disputed the power of the court, and there can be no doubt that, had sufficient ground existed, or had the matter not involved merely a question of costs, it would have been exercised.

The next case that I shall mention is *Cooper* v. *Jagger*, which will be found in 1 *Chitty*, 445. It was decided in the King's Bench in 1819. Before that case, the court of King's Bench had adopted a rule much more stringent than the twenty-third rule of the Supreme Court, to which I have referred. The King's Bench rule was substantially this : "If a cause be moved in court in the presence of both parties, and the court shall thereupon make an order, no person shall afterwards cause the same to be moved contrary to such rule or order, under pain of attachment; and the counsel knowingly making such motion, shall not be heard here in any cause during the same term." In *Cooper* v. *Jagger*, (*supra*,) in Easter term, 1819, Andrews,

for the defendant, obtained a rule *nisi* for setting aside an attachment, on the ground that the same had been irregularly procured, after notice that the defendant had been rendered. Chitty, for the plaintiff, at that term, opposed the rule, and it was discharged. Thus we have, again, the case of a motion on which both parties were heard, and a decision made. In Trinity term, 1819, Andrews moved on affidavits to set aside the attachment. Chitty showed cause in opposition, and he submitted "that the motion could not be entertained, because the case had been once heard, and disposed of; and therefore the court would not allow the same matter to be discussed again;" and he referred to the rule of the court which I have given above. But the court held that as the rule was discharged on the former occasion, in consequence of a misapprehension of the facts, the rule of the court cited did not apply. The motion which had been denied in the previous term was therefore "*opened*" again; and the rule *nisi*, which had originally been obtained, was made absolute. Thus the court opened the matter, heard it again on additional papers, and decided just the reverse of what the former order had been.

Contenting myself with these English cases, I shall proceed to mention some in the books of our own state. The rule will be found to be the same both at law and in chancery. The only restraint upon the privilege of having a motion opened, is that leave must first be had of the court. An early case presenting the question was *Simson* v. *Hart*, in the court of errors, (14 *John.* 62,) in 1816, which reversed the decision of the chancellor in the same case, in 1 *John. Ch.* 93. Judge Spencer, in *Simson* v. *Hart*, (*Id.* 75, 76,) says: "The motion," (in the mayor's court, which was to grant an order for a set-off,) "was a summary application; and it is a fact, well known, that such motions do not admit of that grave discussion and consideration, as questions arising on demurrer, in arrest of

judgment, or for a new trial. In the same court, such decisions are not considered so final and decisive as to furnish a bar to another and further discussion of the question. Courts, to prevent vexatious and repeated applications on the same point, have rules which preclude the agitation of the same question on the same state of facts. These rules are for the orderly conduct of business, and are not founded on the principle of *res adjudicata.* It is not uncommon, in courts of law, to deny a motion one day, and on another to grant it on a more enlarged state of facts. It appears to me that even that (the mayor's) court, on another application, by bringing before it the additional facts, might and ought to entertain the question a second time. I would not in the slightest degree impugn the salutary principles which preclude one court from re-examining, except in the regular method of appeal or writ of error, the judicial decisions of another court having jurisdiction of the subject matter. The cases cited and relied on by his honor the chancellor, (1 *John. Cas.* 436; 6 *Term Rep.* 471; 1 *Sch. & Lef.* 201;) meet my most decided approbation; but in my judgment, the principles adopted in those cases do not apply to a decision upon a summary application, nor to a case where, from the ascertainment of a new fact not brought before the court on the original application, even the same court might with entire propriety hear a new discussion of the question." Again, in *Standard* v. *Williams,* in 1833, (10 *Wend.* 599,) Chief Justice Nelson, denying a motion of the defendant, on the ground that the plaintiff's affidavit was a perfect answer to it, said: "If the affidavit be untrue, or the transaction upon which the allegation of the plaintiff be founded can be explained, the defendant may apply to the court, upon notice, to vacate the rule denying his motion." Again, in 1835, in *Mitchell* v. *Allen,* (12 *Wend.* 290,) Sutherland, justice, said: "The motion cannot be heard. It is the settled practice that a motion cannot be renewed *with-*

Belmont v. Erie Railway Company.

*out leave of the court.* The case of *Standard* v. *Williams,* decides nothing to the contrary of such practice. It is there said, the party may apply to the court, upon notice, to vacate the rule denying his motion. So he may, *but not without leave of the court* previously obtained, which *is always granted,* if, in the circumstances of the opposition, there is any thing to excite suspicion of unfairness, or a belief that the moving party is taken by surprise. Indeed, it is not unusual for the court, without application, to annex such leave to a denial of the motion." In *Dodd* v. *Astor,* in 1847, (2 *Barb. Ch.* 395,) Chancellor Walworth said: "The application of the appellants was properly denied, upon the ground that it was in substance a renewal of the former application, *without the* leave of the court." The last case that I shall cite, prior to the change in our judicial system, which was effected by the constitution of 1846, and the judiciary act of 1847, is *Dollfus* v. *Frosch,* (5 *Hill,* 493,) decided in 1843, by Chief Justice Bronson. He states the rule briefly: "A motion cannot be renewed without first obtaining leave of the court." Reference may also be made to the note appended to the last mentioned case, in which the learned reporter, the late Mr. Nicholas Hill, in a few terse sentences, citing authorities, gives a summary of the general practice on this subject, as follows: "The doctrine of *res adjudicata* does not strictly apply to these motions in the course of practice, being addressed to the discretionary power of the court. Hence, the court may allow a motion to be renewed, provided that in the circumstances of the opposition there be any thing to excite suspicion of unfairness, or a belief that the party moving is taken by surprise; or, if the motion be denied, because of some defect in the moving papers arising from ignorance of the practice. So the party may obtain leave to renew, on falsifying the affidavit used in opposition, or showing that the facts stated in it are explainable so as not to amount to a denial of the grounds

of the motion. A motion will sometimes be opened on the question being changed by new materials discovered or arising afterwards. But if the facts remain essentially the same at the time of the application to renew that they were when the former motion was denied, the court will rarely allow the matter to be reheard on the merits."

Passing from the decisions of the late Supreme Court and court of chancery, we come now to the more recent cases, decided by the courts existing under the present constitution, which will be found to be in perfect accord with the practice formerly prevailing. In *Willet* v. *Fayerweather*, decided by Judge Edmonds in 1847, (1 *Barb.* 72,) a second motion was denied on the ground that "the 'new' matter which will alone justify the renewal of a motion *without leave*, must be something which has happened, or for the first time come to the knowledge of the party moving, since the decision of the former motion;" and the court held that if the new motion should be treated as an application for leave to renew the former one, the circumstances of that case required that the leave should be refused.

In *Bellinger* v. *Martindale*, (8 *How. Pr.* 113,) decided in 1853, Judge Gridley, said: "I could give the defendant the right to renew his motion, either on showing cause or not, as he should be advised, *if I were satisfied that the former motion was erroneously decided.*" In the case of *Cazneau* v. *Bryant*, in the Superior Court, in 1857, Judge Woodruff reiterates the rule. Next in point of time, (1861,) is the case of *White* v. *Munroe*, (33 *Barb.* 650,) which I have before mentioned, decided by the general term of this district, and holding that it is entirely discretionary with the court to hear a renewal of a motion or not, and that it may do so on new papers, or on those on which the original was heard, just as the court thinks proper. Following that, is the case of *Smith* v. *Spalding*, in the general term of the Superior Court, in 1864, (3 *Rob.*

615,) in which Chief Justice Robertson states all the rules upon the subject as I have given them, and cites and reviews many cases, including some (though not all) of those which I have mentioned, and some which I have not deemed it necessary to repeat here, considering a reference to his opinion quite sufficient. And, lastly, in 1868, comes the case of *Katz* v. *August,* in which, after I had heard and decided a motion, and, upon application, refused leave to renew it, Mr. Justice SUTHERLAND, at special term, in April, 1868, within his indubitable jurisdiction, and very possibly in wise exercise of his discretion, entertained, on the identical papers on which I had acted, a further motion for leave to renew, allowed a renewal, and finally granted, upon terms, the very relief asked on the original motion, which I had denied.

It would seem, therefore, that if it be possible that any thing should be deemed to be settled by authority, the proposition that a motion may, upon application to the court, be opened and heard anew, if the court, in its discretion, thinks sufficient reason exists for doing so, must be considered as conclusively established.

It was hinted, however, rather than argued, that even if the court might permit a motion to be renewed when it had been denied, the rule would be different where a motion had been granted and the defeated party sought relief by motion. The suggestion scarcely deserves notice, for it would be singular, indeed, if the power of the court were restricted by the consideration of which party sought its aid, or the form of the order against which relief was asked. According to such a theory, if the plaintiffs had obtained, at special term, an order, without notice (as may in some proper instances be done,) appointing a receiver, and the defendants had moved to vacate that order, and failed, they might have it opened and renew the motion; but if (a matter over which the defendants could have no control) the plaintiffs, instead of getting a

receiver appointed *ex parte,* chose to move for one on notice, and the motion were heard upon the same papers upon which the motion to vacate in the former case would have been made, and the opposition to it failed for precisely the same defects that would have defeated the defendants if the motion had come on in the other form— then unless the order was wrong, so as to be reversed on appeal, the defendants, by the skill of the plaintiffs in selecting the form in which they chose to initiate their proceedings, would be deprived of all redress, no matter what case they might afterwards be able to make! The absurdity and injustice of such a proposition are too apparent to need refutation. The practice of the courts is not subject to any such reflection as such an idea imputes. The rule is, and so it is stated in the early books of practice, "the court will open an order upon the application of *either party,*" (2 *Archbold's Pr.* 305, 2*d ed.*) Whether it be the party whose motion was denied, or the other side, the party moved against, who asks the favor, if proper cause exists, the practice is the same. In either case, the order previously entered is "*opened*" or vacated, and the matter heard anew, precisely as if it had never been argued before, and as if the principal or original motion, on all the papers then presented, had then, for the first time, been moved.

In the case of *The Bank of Geneva* v. *Reynolds,* (20 *How. Pr.* 24,) the matter came before the court thus: The defendants moved, at special term, for further time to surrender their principal. The motion was *granted.* On appeal, the general term, consisting of Justices SMITH, KNOX and JOHNSON, held the order not to be appealable, but they all agreed that the discretion of the court below had been improvidently exercised, and that "a *rehearing* ought to be had at the special term." There is a case, therefore, in point, in which the general term concurred in saying, in effect, that the party against whom the

Belmont *v.* Erie Railway Company.

motion was made might, after an order against him, have it opened and heard anew. It is clear, also, that such must have been Judge SUTHERLAND's opinion; for, on more than one occasion, the stenographer's minutes show that he said the order " could be *vacated* or modified hereafter, if necessary." *To sum it all up briefly, it is well settled that whatever can be done upon motion to the court, may by the court, upon further motion, be altered, modified or wholly undone.*

Some confusion has arisen, perhaps, from the use of the word "rehearing" in the motion papers, when this matter first came before me. That term, technically speaking, was appropriate only to the proceeding in chancery by which a certain class of errors in a decree or decretal order could, before enrollment, be corrected. But it had no application to orders made upon mere motion. Those could not be reached by a "rehearing," but were varied or discharged by the court, on application by motion. (1 *Barb. Ch.* 352, 353.) The case of *ex parte Livingston,* (34 *N. Y. Rep.* 555,) cited by the plaintiffs, has no bearing upon the question here presented, for the obvious reason that the order there attempted to be reheard was a final order, partaking of the character of a judgment, while the order before me is merely interlocutory. The points of practice discussed by Justice Morgan were not necessarily involved, he having previously decided, on other grounds, upon the merits, that the orders he was reviewing were wrong, and should be reversed. In that conclusion, all the judges of the court concurred, but in nothing else; and the remarks of Judge Morgan, in other respects than on the merits, were purely *obiter.* But if it were otherwise, they do not, as I have said, touch the case, because this is a motion to open an interlocutory order, while the order which was attempted to be reheard in that proceeding was a final order. That a petition was resorted to, instead of an ordinary action (either being proper in

that case,) does not change the effect or character of the adjudication made upon the hearing. Being a final order, Justice MORGAN's individual opinion was that it could not be touched in any way, except on appeal. It is not necessary to say whether he was right in this. Throughout his remarks, however, (*see p.* 579,) he distinctly shows that if the order had been made upon a mere motion, relief could have been had by a further motion. To that extent there can be no doubt he was correct, and as that is all that arises here, it is not necessary to consider his observations upon the practice in regard to rehearings in chancery. But, in passing, it may be proper to say, that so far as any inference is attempted to be drawn by the plaintiff's counsel, from the remarks of Judge MORGAN, against the right of a party to move the court, when it is presided over by a different judge from the one who heard the first motion, it is unfounded and cannot be sustained. The application is to the court—not to the judge—and any application which the court may entertain, may always be made to the court, however it is constituted. This is so well recognized that when the statute of 5 *Vict. ch.* 5, created two additional vice chancellors, it was provided that one of them should not *rehear* any matter in which an order or decree had been made by the other. So, in this state, in order to cut off the right of a vice chancellor to rehear a matter which had been determined by the chancellor—his superior and appellate officer—an express statute was deemed necessary. (2 *R. S. p.* 168, § 3.) In fact, it never was heard that—unless by the provisions of some statute, and there is none such applicable to any of the existing courts of this state—there was any law, practice or rule, which prevented the court, whichever of its members happened to preside, from hearing and determining any matter *which was a proceeding in court*, unless, indeed, the judge sitting was pecuniarily interested in the case, or related to one or other of the litigants. These views are sustained

by the general term, in *Selden* v. *Christophers*, (1 *Abb. Pr.* 272,) where the opinion was given by Justice Mitchell. In that case, on the argument of a demurrer to the complaint, heard before Justice Roosevelt, the demurrer was overruled, with leave to answer, upon payment of costs, within twenty days. The defendants subsequently moved, upon affidavits, before Judge Morris, (who then held special term,) who modified Judge Roosevelt's order, and allowed the defendants to answer without previously paying the costs. On appeal from the latter order, it was urged that the order could only be granted by the judge who made the first decision. But the court said: "It is no objection to the order appealed from, that it was made before another judge than the one before whom the original order was made. Both orders are properly the acts of the same court—the special term—and not of the judges." So, also, both the general term of this court and the Court of Appeals, entertain motions for rearguments and grant them, and sometimes hold differently from the former decision, although the court was not constituted the same when the cause was originally argued.

The suggestion that the appeal from the original order prevents the present motion being entertained, hardly merits remark. Without wasting time by referring to the books of practice, a single authority, under the Code, will suffice. Thus, it has been held that an appeal from a judgment, even, does not prevent a motion being made at special term to set the judgment aside as irregular. (*Clumpha* v. *Whiting, per Bonney, J.* 10 *Abb. Pr.* 448.) It is much more likely that, by moving for leave, and certainly by accepting the privilege, to have the original motion opened and heard anew, the defendant's appeal from the first order was waived, (*see Peel* v. *Elliott*, 16 *How. Pr.* 483; *Noble* v. *Prescott*, 4 *E. D. Smith*, 139;) but that question does not arise here.

I think I have fully covered every possible phase in

which the preliminary objections interposed to this motion were or can be presented, and have demonstrated by authority, as I prefer to do on every branch of this motion, that they are utterly destitute of legal sanction, and that unless the practice of the courts from early days, uninterruptedly to the present time, is to be overruled for this particular case, they must be disregarded.

This brings us to the second subject which, in logical order, should be considered, viz: Do the defendants present such a case as justifies the granting of the preliminary motion to open the rule taken against them ?

Although some of the precedents cited, would sanction the granting of the application, even if the facts remained precisely the same, provided I were convinced that the decision previously made was erroneous, I do not mean to proceed upon that view of the practice. I shall take this as the test of whether the motion to open should be granted : Have the defendants shown any material facts which were not presented to the court upon the previous motion, and if they have, were they, so far as such matters then existed, prevented from bringing them to the notice of the judge, by " mistake, inadvertence, surprise, or excusable neglect?" (*See Code,* § 174.) I am stating the inquiry more strongly against the defendants than the rule actually requires; but of this the plaintiffs cannot complain, nor ought the defendants, since their counsel conducted the argument upon the theory that possibly they might be held to that test.

The defendants insist, first, that there are now before the court, the answers of the defendants against whom the charges of the plaintiffs are specially directed, fully and fairly denying the whole equity of the bill, and that such was not the case when the former motion was heard; secondly, that it is now, for the first time shown, and conclusively proven, and substantially undenied, that that this is a collusive suit, not brought by the plaintiffs in good

Belmont *v.* Erie Railway Company.

faith, and for the purpose for which it was ostensibly instituted, but that, in truth and in fact, the plaintiffs are merely instruments in the hands of Daniel Drew, Frank Work, and Richard Schell; who, it is charged, were engaged in speculations, by which it was their interest to depress the value of the stock of the Erie Railway Company; and that this suit was brought for that purpose, under an arrangement by which Drew was to pay half of the expense of the litigation, and Work and Schell the other half in equal portions; and thirdly, that since the former order, the state, by its attorney-general, has interfered—taken proceedings against the corporation, and obtained an order which is inconsistent with that granted in this action. The statement of the arrangement as to costs, under which the suit is conducted, is made on the present motion, for the first time; and it is sworn to by Mr. Fisk, who says that the information upon which he bases his belief that that arrangement exists, was given to him after he made his affidavit of the 18th of November, which was read on the first motion. The affidavit of Mr. Fisk was verified on the 4th of December—was served with the motion papers, and its assertions as to the arrangement about the costs of the suit, though made on information and belief, must be treated as correct, because the plaintiffs have not denied their truth, and they were matters directly within their own knowledge.

An affidavit of Mr. Belmont was read in opposition to this motion, but it contains not a word of denial that the suit is at the risk and expense of the persons mentioned in Mr. Fisk's affidavit.

As an excuse for not being fully prepared, the defendants say they were surprised by the case being called out of its usual order on the calendar. That without previous notice or intimation to them it was advanced about a hundred cases, and that otherwise, several days would have elapsed before the motion could have been reached, which time

they would have had for preparation. They also urge that the order to show cause, which was returnable on Monday, the 23d of November, at noon, gave leave to the plaintiffs to serve such other affidavits as they might desire on or before Saturday, the 21st day of November, at noon ; and they say, (and I think justly,) that they cannot be charged with neglect in not fully preparing for the motion until they knew definitely all the papers upon which they were to be required to meet it. The stenographer's minutes show also, that the counsel for the defendants claimed that they worked diligently from the time that the papers for the motion were served, until 12 o'clock on Saturday night, devoting all the time they possibly could to the case. I think this statement must suffice to show that want of preparation was certainly not chargeable to negligence on the part of the defendants. Six days were certainly not very long, even if the defendants were bound to assume that no further papers would be served, or that if they were, they would not change the character of those to be drawn in opposition, for counsel to ascertain the facts, examine the law, and prepare upon both fact and law to discuss a cause involving such grave results and so many millions of dollars.

Moreover, the counsel were not censurable for resting from their work on the Sunday intervening, nor indeed would it have been inexcusable had they even delayed until the time limited by the order for the plaintiffs to serve additional papers had expired before commencing their labors. I do not mean to say that would have been right, but that it would have been neither extraordinary nor inexcusable. The defendant could not know that the privilege of serving further papers would not be availed of by the plaintiffs, and it is not very reasonable to expect a party to prepare his defense until his adversary has fully advised him what he is to answer. The additional papers might so alter the case that all labor directed to meeting

the original papers might be useless. It is unjust to allow a moving party to cast the burden of double preparation upon his adversaries, under the penalty of being charged with gross negligence, when their only omission was an effort to avoid what might prove to be superfluous labor.

Moreover, I think the counsel had a clear right to rely upon the presumption that the causes would be heard in their regular order upon the calendar, and to act upon that belief in calculating how long they would have for preparation. I do not doubt that the judge may advance a case, either upon motion or of his own volition. But parties, unless they are advised to the contrary in any particular case, have the right to assume that the regular order of business will prevail. Thus, doubtless the court might call up a cause at the foot of the circuit calendar, which would regularly be reached perhaps a year hence; but will any one question that it would be a surprise, and that if the party prejudiced should move to open the judgment, and show that, relying upon the fact that he would ordinarily have a year to prepare, he had not got ready for the trial, and that he had no notice that the cause was thus to be advanced, the court would make haste to give him relief? The principle is the same, whether the time be a year or a few days. It is a surprise in either instance.

But it is argued that these considerations were all addressed to the judge then holding the special term, and that he gave them such weight as he thought they deserved, and decided to proceed with the hearing, and that those matters cannot now be reconsidered. The judge certainly did proceed, notwithstanding these strong reasons for postponement; but it is manifest, from many of his remarks, that he did so with some hesitation about its propriety, for he several times stated that he should be inclined to postpone the case, but for the proceedings taken in

another suit, and he finally decided to go on because "*it could do no harm;*" doubtless meaning and understanding perfectly well that if the further papers which the defendants sought time to procure presented a proper case, they could obtain relief in precisely the way in which they subsequently, by the present motions, have endeavored to get it. But be this as it may, the defendants have the right to urge those grounds, whether taken before Judge SUTHERLAND or not, as an excuse for their apparent neglect.

They have the right to do so, because, as I have already shown by abundant authority, the ruling upon such matters is not *res adjudicata.* But to put this branch of the case beyond cavil, and to show how liberally courts act in relieving parties from the consequences of neglect, I need cite but one authority. It is the case of *Leighton* v. *Wood,* (17 *Abb. Pr.* 177.) In that case the defendant moved, at special term, to open an inquest taken against him at the circuit, under the following circumstances. The suit was brought to recover damages for personal injuries alleged to have been sustained by the plaintiff at the hands of the "municipal police," acting, as it was averred, under the orders of the defendant, then mayor of the city of New York. The cause was on the circuit calendar in June, 1862, when it was "reserved generally." On December 3, by written consent of the respective attorneys, the case was placed on the day calendar for December 4. On the latter day, it was duly reached in its order and postponed, at the request of the defendant's counsel, to the following Monday, on the ground that he was engaged in the Superior Court; and so from day to day till the succeeding Thursday, when it was again called. At that time it was stated that the engagement of the defendant's counsel would be concluded during the day, and it was suggested that· the case go over to the next morning, but on the plaintiff's counsel stating that he preferred to wait in court till the engagement terminated, the court directed

that course to be taken. About two o'clock, the defendant's counsel, having finished his engagement, appeared in court, and then stated that he desired to move a postponement, and had sent for his client to make an affidavit. The court waited for nearly an hour, when the affidavit arrived, and the defendant's counsel read it and moved a postponement. The affidavit stated that the defendant hoped and expected that a settlement of the cause might be made, and likewise that four material witnesses were absent at the war. The court overruled the application, and directed the cause to proceed. The next morning the plaintiff's counsel appeared with his witnesses. The defendant's counsel again moved to postpone, but the court said that matter had been settled the day before, and the cause must proceed. While a jury was being impanelled, the defendant's counsel procured an order to show cause on the following Monday why a commission should not issue, and staying all the proceedings on the part of the plaintiff in the meantime. The court observed in the presence of the defendant's counsel, that the stay was invalid, and that he should disregard it, and directed the plaintiff's counsel to proceed with the trial, but subsequently adjourned the case until the ensuing Monday. The stay was at once vacated by the judge who had allowed it. All these facts were known to the defendant's counsel within a few minutes, and to the defendant either on that or the next day. Formal notice of them was given to the defendant's attorneys on Saturday. On Monday, the defendant's counsel failing to appear, an inquest was taken, resulting in a verdict for the plaintiff for $4000. I believe it is a part of the history of the times, and was well and generally known when the motion was made, that the real cause of the defendant's counsel's failure to attend to the trial, was that Mr. Wood declined to submit his case before the judge who then temporarily held circuit in the city of New York, but who resided in one of the

interior districts.    After the inquest, the defendant moved, at special term, to open the case.    The motion was made, first, as a matter of right, upon points of. certain alleged irregularities, which, however, were held not to be well taken; and, second, as a matter of favor; and upon this latter ground, and as an excuse for the omission to attend the trial, the same matters which had been presented to the circuit judge were reiterated before the court at special term.    The court opened the inquest, and its action was affirmed, on appeal, by the general term, composed of Judges SUTHERLAND, LEONARD and BARNARD—the last named judge, however, taking no part in the decision. The opinion was pronounced by Judge LEONARD, who said: "Such relief is often granted, even against the open and confessed negligence of the defaulting party, or his attorney or counsel."    After holding the order to be not appealable, the court proceeds: "But were we to look into the merits of the application, considering the nature of the action, the amount of the recovery, the number of witnesses required, *and the shortness of the time left to procure them after the learned judge who presided at the circuit had decided that he would not postpone the trial*, it would be impossible to arrive at any different conclusion from that of the judge who vacated the inquest, or to doubt the soundness of the legal discretion which directed the orders now appealed from."    The language used is singularly appropriate to the present matter; and, I think, no one can doubt that within the rule that case declares, and the application of it which it enforces, I should be derelict in my duty, and be chargeable with an arbitrary and unjust exercise of my judicial discretion, if I did not hold that the defendants have excused, and should be relieved from the consequences of, their neglect—if, indeed, neglect be attributable to them, especially when no one can fail to see that the proceedings were not conducted with that order, decorum, dignity and deliberation, which should

characterize judicial tribunals, and through which only can safe and accurate conclusions be reached.

It is very usual when a motion to dissolve an injunction or to vacate the appointment of a receiver has been denied upon affidavits, to permit it to be renewed upon the coming in of the answers in the cause. But I shall not stop to inquire whether upon the bill, answers and affidavits generally, this case is not within the rules which Mr. Justice Woodruff has stated with great accuracy, and in a remarkably clear and beautiful style. Speaking of injunctions, and his views are even more apposite respecting receivers—which are a sort of execution before trial— Judge Woodruff says : " The frequency of applications for injunctions, *pendente lite*, and I may add, the facility with which they are obtained, may properly induce us to recur to some familiar rules which ought to govern the court in the exercise of its summary, and in a degree, arbitrary power. It should be guarded by a most cautious discretion, forbidding its exercise when it will operate oppressively or work immediate injury, or where the right of the plaintiff is doubtful, or the facts are not clearly ascertained. It has been well said, that 'there is no power, the exercise of which is more delicate, *which requires greater caution, deliberation* and sound discretion, or is more dangerous in a doubtful case, than the issuing of an injunction' (*Fredericks* v. *Mayer*, 1 *Bosw.* 227.) 'The whole equity of the bill is denied, and all that results from the addition of affidavits to the bill and answer respectively, is that the witnesses differ in their statements as widely as the parties do themselves.' " (*Judge Woodruff, in Duigan* v. *Hogan*, 1 *Bosw.* 652.)

A very brief analysis of the pleadings and affidavits would show how justly these observations apply here ; but the labor is unnecessary, because the one conceded fact that this case is prosecuted at the risk and expense of persons other than the nominal plaintiffs, introduces a

new feature—not developed before Mr. Justice SUTHER-
LAND—which, upon authority, is decisive of the motion.
I quote the language of Vice Chancellor, Sir W. Page
Wood, in *Filder* v. *London and Brighton South Coast Rail-
way Company*, (1 *Hem. & Miller*, 489,) as showing what is
the true test of whose the suit is, and the effect of the
plaintiffs being the instrument in the hand of other
interests. In that case it appeared that the plaintiff had
been indemnified against the costs of the suit, just as it
appears here that Drew, Work and Schell have agreed
with the plaintiffs to bear and pay the expenses of the
litigation. The vice chancellor said: "Taking the case
before the lord chancellor and Coleman's case together, I
think the principle to be deduced is this, that to entitle a
shareholder to maintain a suit of this nature, the *risk and
responsibility* must be upon him, so that the court can feel
that he is acting for the benefit, or what he believes to be
the benefit, of the company. *Prima facie*, every share-
holder has a right to come here, as representing all the
shareholders, to prevent an act of this description, and
the court does not require any evidence that the remaining
shareholders, or any of them, have concurred in the filing
of the bill, because, if the act be illegal, it is presumed to
be for the benefit of all, that it should be stopped; but
if it be made to appear, and the attention of the court is
called to the fact, that the plaintiff is not moving in his
own behalf, but is set in motion by some one else who
undertakes to pay the costs, and to indemnify him against
all risk, the whole aspect of the case is at once materially
altered, because the suit is no longer under the direction
of the plaintiff, but another person, whose interests may
be utterly adverse to those of the company, is in a posi-
tion to control the proceeding. What the court looks to
is this, is the suit *bona fide* the plaintiff's own suit, or is he
merely the hand by which some one else acts? *And there
is no ingredient entitled to greater weight in arriving at a con-*

*clusion on this point than the question, who is responsible for the costs of the suit?"* It would almost seem as if the vice-chancellor were talking about the case now before me. (*See also Forrest* v. *The Manchester, &c. Railway, decided by Lord Chancellor Westbury,* 7 *Jurist, N. S.* 887 ; *Rogers* v. *Oxford R. R. Co.,* 2 *De Gex & Jones,* 674.)

Nor are we without authority to the same point in our own state. The court, in *Waterbury* v. *Merchants' Union Express Company,* (50 *Barb.* 157,) said : " In the answer it is alleged with great distinctness, on the information and belief of the defendants, that the plaintiff is not the real party in interest, but that the suit is presented wholly at the instigation and in the interest of the rival express companies, which are the real and actual plaintiffs in the controversy. An illusory suit in the name of the shareholder, but really prosecuted by and in the interest of a rival and competing company, cannot be maintained for the purpose of dissolving or restraining another association or company, of which the nominal plaintiff may be a member."

It is plain, therefore, that upon the undenied fact, now appearing, that the costs of this litigation are to be borne by parties other than the plaintiffs, whose interests are hostile to that of the Erie Railway Company, long and well established precedents require that any relief, especially upon an interlocutory motion, must be refused.

The order admitting Theresa Robinson as a party plaintiff, made by Judge SUTHERLAND on the 19th of November, 1868, does not affect the matter. Where a suit is brought by one, on his own behalf and all others similarly situated who see fit to come in and avail themselves of its benefits, such others have no control of the litigation, and are not authorized to interfere until a decree has been made in the cause. (*Innes* v. *Lansing,* 7 *Paige,* 585.) It results from these views, that the court has the power to open the order made at special term ; that this is a proper case

to exercise that discretion, and that upon the matter as now presented the order which was then made should be vacated, and the motion for a receiver denied, and the preliminary injunction discharged. An order to that effect will accordingly be entered.

And here I might stop; but perhaps my whole duty could not be said to have been fully performed if I did not say that I should feel bound to hold that this is one of the cases, if ever there were one, in which the order on the original motion should be opened, even if the case presented no fact which was not then fully before the court, because I cannot hesitate to say that the decision was utterly contrary to authorities which were conclusively binding upon the court at special term, and which could not rightfully be disregarded; and, therefore, from the haste with which the case was disposed of, I think it must be assumed that the decision made was clearly the result of inadvertence—a lack of recollection of the extent to which the cases, binding upon the judge sitting in that branch, had gone. It is true that such error would be reached by an appeal, but whether a party will resort to one or other of two remedies available to him is a matter which rests very much with himself; and neither timidity, nor any thing else, should sway a judge to shirk the responsibility which the law and the rights of parties impose upon him. It was said, by the late Judge Cowen, that it was "the duty of a judge to place himself between the accused and public clamor." Indeed, however, one of the very objects of the rule permitting a motion to be opened upon the same state of facts, is to prevent the necessity, in a clear case, of obliging the party prejudiced to resort to the more dilatory and expensive remedy of appeal.

I shall therefore proceed to state, very briefly, why the order against which this motion is directed is so plainly erroneous in law as to justify a motion being entertained

on that ground alone, to vacate it, as being the result of obvious mistake.

It is not doubted that a stockholder of an incorporated company may have an injunction to restrain illegal acts of the directors, and in certain cases may have a receiver appointed of a particular fund, the proceeds of an unlawful act. Such was the case of *Fisk, &c.* v. *The Chicago and Rock Island R. R. Co.* (36 *How. Pr.* 20.) But the bill in this action, while neither charging insolvency nor asking to dissolve and wind up the company, prays that "a receiver may be appointed of all and singular the funds and books and papers and rights of action of such company." It makes no case for any partial receivership. In fact, unless the general receivership prayed for and granted, could be allowed, the extent of the plaintiffs' case, in any aspect, would be for an injunction. That any particular fund, the result of any supposed illegal act, was sought to be reached, is quite out of the question; and, indeed, that no such idea was either in the mind of the counsel for the plaintiffs or of the court, is settled decisively by the fact that, after the order for a most sweeping and general receivership was granted, the court in staying, to some extent, proceedings under it, expressly provided, "but this stay shall not prevent said receivers from calling upon the directors and officers of said company by legal proceedings or otherwise;" not for the proceeds of some excess of power, but "for accounts of the earnings and receipts of said company, and for payment of all surplus of said earnings over and above the amounts thereof necessary to pay the legitimate expenses of running said railroad and operating said ferries!"

It would be quite pertinent and proper to cite against removing all the directors (which such a receivership in effect does) upon charges of misconduct against a few, the remarks of the court in *Waterbury* v. *Merchants' Union Express Company*, (*ubi supra*,) "The infidelity or miscon-

duct of some, or even of all, the trustees or managers of such an association, affords no ground for taking away the rights of the shareholders who constitute the company, either by dissolving it, or taking away its management and placing it in the hands of an officer of the court. In such a case, the principles of remedial or preventive justice go no further than to enjoin or forbid the misconduct, or remove the unfaithful officer. I am not aware of any authority for dissolving a corporation or an unincorporated stock association, or for taking its management from its proprietors, or shareholders, on the mere ground that one, or even all, of its trustees are unfaithful. The court may enjoin the trustee, or suspend or remove him, and if necessary, may order a new election, but cannot substitute its own officer." The court then proceeds to say (as is also the case here) : " There are trustees enough, against whom no charge is made, to carry on the business." If it be said that the bill insinuates that all the directors are controlled by three, whose conduct is impugned, the answer is plain—the removal of those three will leave the others uninfluenced and unfettered; but if not, or they should afterwards prove recreant to their trust, they may also be displaced and others elected. But all this must be done by a proper proceeding.

But I do not quote the last mentioned case, as it was only a special term decision, as of controlling weight. Nor yet shall I rely upon the remarks of Judge Selden, in *Robertson* v. *Bullions,* (1 *Kern.* 243.) Still, a few paragraphs from the opinion of one of the ablest judges who ever sat in the court of last resort in this state, may be read with propriety and advantage : " These incorporated societies " (religious) says Judge Selden, " are not to be regarded as ecclesiastical corporations, in the sense of the English law, which were composed entirely of ecclesiastical judicatories; but as belonging to the class of civil corporations, to be controlled and managed according to

the principles of the common law, as administered by the ordinary tribunals of justice." He then proceeds to show that Chancellor Kent had held that the court of chancery did not possess any general supervisory control over the officers of civil corporations, and then adds: "But if it be admitted that a court of equity has power, by virtue of its general jurisdiction over every species of trust, to interfere at the instance of a corporator, in cases of gross violation of duty by the managing officers of a civil corporation, which is at least doubtful, the question still remains, How may this jurisdiction be exercised? Does it extend to the removal of the officers of the corporation? It is difficult to conceive from what source the court, independent of legislative enactment, could derive such a power. This class of officers receive their authority directly from the sovereignty of the state. The statute prescribes their qualifications, the mode of their election, and the tenure of their offices. What power has the court of chancery, or any other court, to set aside the statute, to impose conditions to the holding of the office, which the statute does not impose? There is a wide difference between this description of officers and mere private trustees, whose powers rest solely upon individual contract. There, if the conditions of the contract be violated, the office is rightfully forfeited; and the court may enforce the forfeiture at the instance of the party aggrieved. But the powers of corporate officers have a source above that of mere private contract, over which the court of chancery has no paramount authority. *No such power was ever asserted or claimed by the English court of chancery.*" Now, of course, it is to be conceded that these remarks were made respecting a corporation confessedly not within the statute upon which the plaintiffs' counsel place their reliance; and in that aspect, perhaps, the case is not to be regarded as an authority in point, but I cite it to show that, independent of the statute, the power to remove the

directors does not exist. We shall soon see what change the statute makes.

.Passing then from cases not presenting precisely the question which arises here, I refer to a general term decision made by Judges SUTHERLAND, INGRAHAM and CLERKE, in 1855, (*Howe* v. *Deuel,* 43 *Barb.* 504,) which is directly and fatally in point. The opinion was delivered by Judge INGRAHAM, both of his associates concurring; and as the syllabus of the reporter is a terse and truthful statement of the points presented and decided, I need only quote his language: "The visitorial powers conferred upon the court of chancery by the article of the Revised Statutes relative to proceeding against corporations in equity, can only be exercised by the Supreme court, on an *application made at the instance of the attorney-general, or a creditor of the corporation,* or a *director, trustee* or other *officer* having a general superintendence of its concerns.

"An action *cannot be brought,* under the statute, *by a stockholder* against the corporation and its trustees, to have the corporation dissolved and restrained from the exercise of corporate powers, to restrain the trustees from excising any powers as trustees, and for the appointment of a receiver, and the sale of the property of the corporation.

"*Nor can the court entertain such an action,* or grant the relief asked for, *under its general powers* as a court of equity.

*In no case,* except in respect to moneyed corporations, or *insolvent* corporations, can a *stockholder* have a receiver appointed, on a preliminary injunction, with authority to take entire possession of the corporation, and thereby work its dissolution."

To the same effect is the general term decision in *Latimer* v. *Eddy,* (46 *Barb.* 61;) the opinion being delivered by Judge SUTHERLAND who, among other things, says: "*A court of equity has no visitorial power over corporations, except such as may be expressly conferred on it by statute.*"

Here, then, this matter must end; for let it be remem-

bered that the plaintiffs bring this action as stockholders, and that, as such, they have, according to those cases, no standing in court to obtain the relief they seek; and those decisions, whether right or wrong—though I do not mean to intimate, for I have not a doubt of their correctness— are of binding force and controlling authority upon every judge of the court when sitting at special term.

Perhaps before concluding it will reasonably be expected that I should express an opinion upon the very important matter which, though of course, after what I have said, not necessary to be determined, was fully discussed upon the argument, and has been carefully considered, viz. have the directors the power to issue bonds for the amounts they may borrow to complete and finish, or to operate the road and convert them into stock. I shall, therefore, say a few words upon that topic, giving my views, however, in a very general way.

The power is claimed to exist by force of the tenth subdivision of the twenty-eighth section of the "Act to authorize the formation of railroad corporations, and to regulate the same," passed April 2, 1850, (*Sess. Laws*, 1850, *ch.* 140.) Against a construction of the statute which asserts the existence of the power to issue these, briefly termed, "convertible bonds," the plaintiffs cite the ninth section, and they claim that the stock can only be increased in accordance with its provisions, and they suppose that this construction was given to the statute by Judge SUTH- ERLAND, last spring, in the cases of *The People* v. *Erie Railway Co., and Schell and Bloodgood* v. *The Same.* I think it cannot be said that the statute received any construc- tion in these cases. Nothing can be said to have been decided by them except, which was proper enough upon the facts stated in the complaint, that the plaintiffs, under the circumstances therein disclosed, were entitled to the injunction they prayed. The bills in those suits charged that the issue of the stock, which was the subject of the

complaint there, was not· made in good faith as a conversion of bonds lawfully issued for money borrowed; and that the bonds themselves were not given for money actually borrowed, but were issued to Drew as a part of a fraudulent scheme or contrivance by which he, for his personal benefit, while a director of the company and standing in a position of trust towards it, should be enabled to create additional shares of the stock of the corporation.

Now, if the judge, upon all the papers before him, thought that charge sustained, then it was not necessary, in order to continue the injunction, that he should consider the question of power to issue convertible bonds at all, which undoubtedly the complainants did also raise. As the judge did not accompany his decision with any statement of the facts which he found, or the reasons upon which he based his conclusion, I cannot say that he examined or passed upon the question now presented. He did not enlighten us by any opinion as to what he deemed the true construction of the statute, and we must therefore inquire into it for ourselves, without the assistance which we should otherwise have derived from his labors. When a case is decided, without any opinion being given, and there can, by any reasonable view of it, be more than one point upon which it could have been disposed of, it cannot be regarded as an authority on any question, because it is impossible to say which point the judge examined and decided. So, also, no principle can be deemed to have been settled, by the general term having affirmed those cases, because the affirmance was by default. Nothing was argued—nothing considered, and, of course, nothing decided.

I do not doubt that if the court were satisfied that bonds were about to be issued by the directors of a corporation, not for the payment of money actually borrowed for the purposes authorized by the statute, but as a part of a fraud-

Belmont *v.* Erie Railway Company.

ulent device to increase the stock, the issuing of them might be restrained by injunction; nor that while the bonds remained in the hands of any persons affected with notice that they did not represent a bona fide indebtedness, but were issued with such fraudulent design, the issuing of stock in conversion of them might also be enjoined. But, as the papers present the facts, that does not touch the question here. The point here involves just this proposition: Have the directors power, in a proper case, to issue convertible bonds, if the capital stock of the corporation be full, and the stockholders do not authorize any increase of it, pursuant to section 9? Neither of the learned counsel cited any case, except those from which I have already shown we can derive no light, and I know of none, myself, purporting to construe the statute on this subject. To my mind, however, the question is neither doubtful nor difficult. Section 9 and sub-division 10 of section 20 are entirely distinct, and contemplate and provide for entirely different purposes. It seems to me the legislature had two cases in contemplation. One was the *mere increase of capital stock;* that was to be the act of the stockholders. The other was the *borrowing of money for certain purposes.* Power to do that, with such incidents as should make it effectual, and afford the best facilities to execute it in the most advantageous methods for the interests of the company, was conferred upon the *directors.* By section 9, the case of *mere increase* of capital stock was regulated. Such increase might be desirable, yet perhaps there might be no pressing haste about it; and in such cases compliance with the detail required by section 9, which would consume considerable time, might be well enough. But another contingency might happen, for which the slow process of that section might be totally inadequate. It might be that the sale of stock, if any remained unissued, would not be rapid enough for the needs of the corporation; or perhaps when all the stock had been

taken, its necessities might, temporarily, be so urgent that they would not bear the delay of proceedings to increase the stock under section 9, and that the life of the company depended upon prompt action. Besides, it is by no means clear that an increase by the act of the stockholders is authorized to relieve the company from that through which it might be placed in the greatest strait, viz. a previously incurred debt. Such cases would be covered, and such calamities averted, by the 10th subdivision of section 28, which authorizes the borrowing of money for certain purposes, and the issuing of bonds, and the mortgaging of the corporate property and franchises. It is plain that the two sections are wholly independent of each other, and that one refers, as I have said, to *mere* increase of stock, and the other to the borrowing of money, and securing its payment. Now, that the power to borrow money, issue bonds, and mortgage the corporate property and franchises is conferred on the directors, is not denied; and the statute gives it plainly, but not more so than it adds that the " *directors* may confer on any holder of such bonds the right to convert the principal due or owing thereon into stock, under such regulations as the *directors* may see fit to adopt." It is argued that this right can only be conferred when there is stock remaining unissued. The answer is, the statute has not said so. Nor has it said that the power, which is expressly granted to the "directors," not to the stockholders, shall be in any wise restricted or controlled by section 9, and it was very easy to have expressed it, if such had been the design, and I must assume that it would have been done, if such had been the intention, because there is nothing inconsistent in providing that the stockholders may increase the stock in a certain way, and that by the action of the directors an increase of stock may be worked in another way. The power to give the privilege of converting the bonds into stock is conferred in terms upon the directors, and no condition is

Belmont *v.* Erie Railway Company.

imposed upon the right to give such option, except that the bonds shall have been issued for the purposes above mentioned.

The power, therefore, to issue the bonds, in a proper case, with the right to authorize their conversion into stock, is beyond doubt. And that being so, the right of the directors to issue stock in conversion of those bonds, is clear, not only upon a fair and reasonable reading of the section, but upon the rule that when a power is granted, every thing which is necessary to fully effectuate it and the acts it authorizes, is implied if not expressed; and also because it is but doing voluntarily what by a suit the company might be compelled to do. The holders of such bonds would be entitled either to have the contract to convert them into stock specifically performed, or else to receive compensation in damages; and whether the one or the other, the pecuniary effect on the company would be the same. Nor do I think that it is at all surprising that the power should have been conferred on the directors.

The legislature had seen fit, and necessary to the due administration of the affairs of corporations, to authorize the borrowing of money for certain purposes and the issuing of bonds and the mortgaging of the corporate property and franchises. Through that power, if it stopped there, by mortgaging the "corporate property and franchises," the directors could strip the stockholders of their property. After having thus evinced the intention to repose confidence in those in whom the stockholders, by electing them to office, declared they trusted, it does not strike me as singular that the legislature should have authorized the directors to issue stock for such bonds, and thereby convert creditors who may have had a lien by mortgage upon all the "corporate property and franchises" of the company into mere ordinary stockholders. Such a power was greatly for the benefit of the company and its stockholders,

and is insignificant in trust when compared with the capacity to ruin the corporation which the right to mortgage conferred.

If I had doubt on this subject, in the absence of any adjudication, the practice of directors of this and other companies, brought by annual reports to the notice of the state engineer, the legislature, the attorney-general, and stockholders, and tacitly acquiesced in, until quite recently, would certainly merit attention. The practice of this and of kindred companies—the New York Central, the Hudson River, &c.—seems to have been uniform in favor of the power. This practical exposition of the statute, in the absence of judicial decision, is entitled to great weight, and, in a doubtful case, should determine the construction which the law should receive.

Mr. Sedgwick says, (*Sedg. on Stat. and Const. Law*, 255,) that *usage, custom,* or *practice,* is of similar value to judicial decisions in the construction of statutes, and he cites the maxim, " *optimus legum interpres consuetudo ;*" and also Lord Coke's remarks, that "It is the common opinion, and *communis opinio* is of good ' *authoritie* ' in law." (*See also Broom's Legal Maxims,* 421.).

But, as I have already observed, I have no doubt that the statute is susceptible of but one construction, and that sustains the right of the directors, acting in good faith, and for the purposes mentioned in the statute, to issue " convertible bonds " and to convert them into stock, within the period allowed by law, and " under such regulations as they may see fit to adopt."

Finally, I have only to add that I declare the conclusions which I have reached, without hesitancy, not only from my conviction of their accuracy, but because of the action of the state through its attorney-general, which I incline to think would alone introduce such a new element into this case, as, if there were no other ground, to demand the vacating of the previous order. That being the act of

Belmont *v.* Erie Railway Company.

the sovereign power of the state, overreaches and overrides this private litigation.  In that action all the facts can be properly investigated and ascertained, the rights of every body amply protected, and justice regularly and according to the statute done alike to the state and all others interested; and therefore, even if it were different before, this suit, for any legitimate purpose, has become wholly unnecessary.

Since the foregoing opinion was prepared, the case of *Jenks* v. *The Central Railroad Company* has been published, in which Judge INGRAHAM considers the question of the power of the directors to issue bonds and convert them into stock, without the action of the stockholders, and although the capital stock be full, and he construes the statute of 1850, in that respect, in the same way that I have done.  The question was necessarily presented and distinctly met and decided, and that case is therefore an authority directly in point, sustaining the views I have expressed.

[NEW YORK SPECIAL TERM, January 4, 1869.  *Cardozo,* Justice.]